<u>NOT YET SCHEDULED FOR ORAL ARGUMENT</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 15-1449**

_____

SECURITYPOINT HOLDINGS, INC.

*Petitioner*,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

*Respondent*.

_____

**PETITIONER'S OPENING BRIEF
(FINAL VERSION)**

_____

Bradley C. Graveline
Manish K. Mehta
Sheppard Mullin Richter & Hampton LLP
70 West Madison Street, 48th Floor
Chicago, IL 60602-4498
Tel.: 312-499-6316
Fax: 312-499-4735
Email: bgraveline@sheppardmullin.com
        mmehta@sheppardmullin.com

Laura M. Burson
Sheppard Mullin Richter & Hampton LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA 90071
Tel.: 213-617-5527
Fax: 213-443-2794
Email: lburson@sheppardmullin.com

*Counsel of Petitioner
SecurityPoint Holdings, Inc.*

Dated: August 9, 2016

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1, Petitioner SecurityPoint Holdings, Inc., states the following:

SecurityPoint Holdings, Inc, is a Delaware corporation that owns U.S. Patent No. 6,888,460. The following persons or entities own 10% or more of the outstanding shares of SecurityPoint Holdings, Inc.: Joseph Ambrefe; Douglas Linehan; Raptor Ventures I LP; Raptor Ventures Security Point Media SPV, LP; and Four Solutions, LLC. No publicly held corporation owns 10% or more of the outstanding shares.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Petitioner SecurityPoint Holdings, Inc., ("SecurityPoint") states the following:

1.  **Parties.**

    a.  **Petitioner**.  Petitioner is SecurityPoint.

    b.  **Respondent**.  Respondent is the U.S. Transportation Security Administration ("TSA").

2.  **Rulings Under Review.**

SecurityPoint petitions for review from TSA's October 14, 2015 Order denying SecurityPoint's request that TSA make certain specific changes to language added by TSA to the Memorandum of Understanding governing the Checkpoint Advertising Program ("MOU").  In this final order, TSA made certain changes to the MOU, but refused SecurityPoint's requested revisions.  TSA's October 14, 2015 Order is found at AR Item 2, JA 971-1265.

SecurityPoint further seeks to supplement the record TSA compiled for this Court's review of its October 14, 2015 Order.  SecurityPoint filed a motion to supplement the record on April 11, 2016.  (ECF Doc No. 1608173.)  On April 14, 2016, the Court deferred ruling on SecurityPoint's request to supplement the record pending further order of the Court.  (ECF Doc. No. 1608777.)

3.     **Related Cases.**

On October 28, 2014, this Court granted SecurityPoint's March 15, 2013 petition for review of a prior TSA order, Petition No. 13-1068.  *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184 (D.C. Cir. 2014).  This Court found the prior TSA order arbitrary and capricious, and vacated and remanded the prior TSA order.  *Id*.

Currently pending in the United States Court of Federal Claims is the action styled *SecurityPoint Holdings, Inc. v. United States of America*, Civil Action No. 1:11-cv-00268, before the Honorable Judge Eric G. Bruggink (the "Patent Case").  SecurityPoint brought the Patent Case pursuant to 28 U.S.C. § 1498(a) and seeks to hold the United States government liable for infringement of multiple claims of U.S. Patent Number 6,888,460 (the "'460 Patent") issued May 3, 2005, and titled "Advertising Trays for Security Screening" because of the use of the patented invention by or for the United States government at airports throughout the United States.

# **TABLE OF CONTENTS**

**Page**

I. STATEMENT OF JURISDICTION ....................................................................1

II. STATEMENT OF ISSUES ............................................................................3

III. STATEMENT OF FACTS ...........................................................................4

     A.    SecurityPoint's Patented Invention. ......................................................4

     B.    The Checkpoint Advertising Program. ...............................................5

     C.    TSA's Infringement Of SecurityPoint's '460 Patent, And The Patent Case. ............................................................................................7

     D.    TSA's New MOU Language. .................................................................8

     E.    The Prior Appeal. ................................................................................9

     F.    The Revised MOU Language. ............................................................10

     G.    The Revised MOU Language Continues To Harm SecurityPoint's Business. .................................................................12

     H.    TSA's New MOU Language Was Intended To Retaliate Against SecurityPoint For The Patent Case; The Revised MOU Language Is Continued Retaliation. ....................................................14

IV. SUMMARY OF THE ARGUMENT ............................................................19

V. SECURITYPOINT'S STANDING ...............................................................23

VI. ARGUMENT .............................................................................................24

     A.    SecurityPoint's Petition For Review Meets The Legal Standard For Showing TSA's Decision Should Be Set Aside As Arbitrary And Capricious And A Violation Of SecurityPoint's First Amendment Rights. .................................................................24

     B.    There Is No Evidence To Support TSA's Claimed Need To Protect Itself From Patent Infringement Claims. ...............................25

C.    TSA's Assertion That The Cost Of Equipment Securitypoint
      Provides Under The Checkpoint Advertising Program Is Not
      Significant Does Not Withstand Scrutiny. ..........................................29

D.    TSA's Attempt To Argue That Some Airports Are Able To
      Agree To The Revised MOU Language Is Insufficient. .....................30

E.    TSA's Implementation Of The New and Revised MOU
      Language Is Not The Result Of Reasoned Decisionmaking, But
      Rather Is An Effort To Retaliate Against SecurityPoint For
      Filing The Patent Case. .......................................................................32

      1.    The Legal Standard. .................................................................32

      2.    The Patent Case Is Protected Petitioning Activity...................34

      3.    TSA's Retaliation Will Likely Chill Future First
            Amendment Activity.................................................................35

      4.    The Patent Case Was A Motivating Factor In TSA's
            Actions. ....................................................................................36

      5.    TSA's Attempt To Distance Itself From Mr. Drenth Is A
            Tacit Admission That He Admitted Retaliatory Intent.............38

VII. CONCLUSION ..............................................................................................41

# **ADDENDUM**

**Page(s)**

U.S. Constitution, Amendment 1                              ADD1

5 U.S.C. § 551                                             ADD2-ADD4

5 U.S.C. § 706                                             ADD5-ADD6

49 U.S.C. § 114                                            ADD7-ADD22

49 U.S.C. § 46110                                          ADD23-ADD24

49 U.S.C. § 44901                                          ADD25-ADD34

# TABLE OF AUTHORITIES[1]

**Page(s)**

## Cases

*ACLU of Md., Inc. v. Wicomico County*
  999 F.2d 780 (4th Cir. 1993) ..............................................................33

*Citizens To Preserve Overton Park v. Volpe*
  401 U.S. 402 (1971), *abrogated on other grounds by Califano v.
  Sanders*, 430 U.S. 99 (1977)..............................................................24

*City of Dania Beach, Fla. v. FAA*
  485 F.3d 1181 (D.C. Cir. 2007)............................................................2

*CSI Aviation v. U.S. Dept. of Transp.*
  637 F.3d 408 (D.C. Cir. 2011)..............................................................2

*De Valle Group v. Puerto Rico Ports Authority*
  756 F. Supp. 2d 169 (D.P.R. 2010) ...........................................34, 36

*Harrison v. Springdale Water & Sewer Comm'n*
  780 F.2d 1422 (8th Cir. 1986) .............................................................33

*Holzemer v. City of Memphis*
  621 F.3d 512 (6th Cir. 2010) ...............................................33, 35, 36

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*
  921 F. Supp. 2d 1137 (D.N.M. 2013)...........................................34, 36

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992).............................................................................24

*Matzker v. Herr*
  748 F.2d 1142 (7th Cir. 1984) .............................................................37

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
  Co.*
  463 U.S. 29 (1983)....................................................23, 24, 30, 35

---

[1]  Authorities upon which Petitioner SecurityPoint Holdings, Inc., chiefly relies are marked with asterisks.

*Powell v. Alexander*
    391 F.3d 1 (1st Cir. 2004)......................................................................23, 33, 35

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*
    769 F.3d 1184 (D.C. Cir. 2014)......................................................................2, 3

*SecurityPoint Holdings, Inc. v. United States*
    Civil Action No. 1:2011-cv-00268-EGB (Ct. Fed. Claims) (AR
    Item 8 at 38-46, JA 154-162.)......................................................................7, 9

*Texas Office of Pub. Util. Counsel v. FCC*
    183 F.3d 393 (5th Cir. 1999) ..........................................................................25

*Tuccio v. Marconi*
    589 F.3d 538 (2nd Cir. 2009) ..........................................................................33

*\*United Mine Workers v. Illinois State Bar Ass'n*
    389 U.S. 217 (1967)..........................................................................................32

*Woodruff v. Mason*
    542 F.3d 545 (7th Cir. 2008) .....................................................................34, 36

## United States Constitution

*U.S. Constitution First Amendment ........................ 3, 6, 10, 13, 19, 22, 23, 24, 25, 32, 33, 34, 35, 36, 38

## Statutes and Rules

5 U.S.C. § 706(2)(A).................................................................................................24

5 U.S.C. § 706(2)(B).................................................................................................24

35 U.S.C. § 103........................................................................................................8, 9

49 U.S.C. §§ 44901 *et seq.*......................................................................................2

49 U.S.C. § 46110(a) .........................................................................................1, 2, 3

Administrative Procedure Act, 5 U.S.C. § 551(6)......................................................2

49 U.S.C. §§ 44901(a), (b)..................................................................................26, 27

# GLOSSARY

| | |
|---|---|
| **'460 Patent** | United States Patent Number 6,888,460, issued May 3, 2005, and entitled "Advertising Trays for Security Screening." |
| **AR** | The items listed in the Certified Index to the Administrative Record that TSA filed on February 1, 2016, ECF Doc. No. 1596550. Each of the items contained in the Administrative Record filed by TSA are cited herein as an "Item" number, with the number corresponding to the one in TSA's Certified Index to the Administrative Record, and are at "JA 1-40, JA 48-50, JA 59-80, JA 106-791, JA 971-1273." |
| **ATL** | Hartsfield-Jackson Atlanta International Airport |
| **BOS** | Boston Logan International Airport |
| **Checkpoint Advertising Program** | A program in which SecurityPoint provides trays, wheeled carts, and tables to U.S. airports for TSA to use in connection with airport security screening free of charge, and under an implied license to practice the '460 Patent, in exchange for the right place advertisements in the trays. To effectuate this arrangement, TSA enters into MOUs with airport authorities, who in turn contract directly with SecurityPoint. |
| **MOU** | The Memorandum of Understanding between TSA and airports governing the Checkpoint Advertising Program. |

| | |
|---|---|
| **New MOU Language** | Language that TSA, officially beginning in August 2012, required in its MOU governing the Checkpoint Advertising Program.  This language (1) requires airport operators to indemnify TSA for any infringement by TSA of others' intellectual property rights, (2) obligates SecurityPoint to license its intellectual property to TSA in perpetuity, and (3) obligates SecurityPoint to surrender its airport furnishings to TSA, even after it has ceased operations at an airport. |
| **Prior Appeal** | The prior appeal that SecurityPoint filed against TSA in this Court, Case No. 13-1068, decision styled *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184 (D.C. Cir. 2014). |
| **Patent Case** | The patent infringement lawsuit that SecurityPoint filed against TSA, styled *SecurityPoint Holdings, Inc. v. United States*, Civil Action No. 1:11-cv-00268-EGB (Ct. Fed. Claims). |
| **Revised MOU Language** | Language that TSA, officially beginning in October 2015, required in its MOU governing the Checkpoint Advertising Program.  This language added the following to the New MOU Language: (1) an indemnification option; and (2) a notice provision governing TSA's continued use of furnishings following termination of the contract. |
| **SAT** | San Antonio International Airport |
| **SecurityPoint** | Petitioner SecurityPoint Holdings, Inc. |
| **SJC** | San Jose International Airport |

**STL**                         Lambert-St. Louis International Airport

**Supp. AR**                    The September 23, 2014 transcript that
                                was the subject of SecurityPoint's
                                motion to supplement the record (ECF
                                Doc. No. 1608173), which document
                                was lodged with this Court on April 11,
                                2016 at ECF Doc. 1608174.  This
                                document is at "JA 755-783."

**TSA**                         Transportation Security Administration

# I.
## STATEMENT OF JURISDICTION

"[A] person disclosing a substantial interest in an order issued by [the Transportation Security Administration] . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit." within 60 days of the order.  49 U.S.C. § 46110(a) (Addendum at ADD23).[2]  Francine Kerner, Chief Counsel of the Transportation Security Agency ("TSA"), issued a letter dated October 14, 2015 (AR Item 2, JA 971-1265), which, as described below, constitutes a final order.  In this Order, TSA made certain changes to the MOU, but refused SecurityPoint's requested revisions.  TSA also failed to provide any reasoned basis for its decision to add certain language to the MOU and its refusal to modify the MOU as requested by SecurityPoint.  SecurityPoint filed a Petition for Review of that final order 60 days later, on December 14, 2015.

SecurityPoint previously appealed to this Court a prior TSA decision contained in a letter from Francine Kerner dated January 18, 2013.  Case No. 13-1068 ("Prior Appeal").  Similar to the present appeal, the Prior Appeal related to TSA's denial of SecurityPoint's request that TSA modify changes it made to the MOU.

---

[2]  SecurityPoint includes copies of the pertinent statutes and regulations cited in this Opening Brief in the Addendum hereto.

In its order dated October 28, 2014, in the Prior Appeal, this Court concluded that it had subject matter jurisdiction over the Prior Appeal. *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1187 (D.C. Cir. 2014). For the same reasons, the Court has subject matter jurisdiction over the present appeal.

Pursuant to 49 U.S.C. § 46110(a), "this court has jurisdiction to review TSA 'orders' issued 'in whole or in part under' Subtitle VII, Part A of Title 49, which encompasses passenger screening and similar security measures under 49 U.S.C. §§ 44901 *et seq*." *Id*. An "order" in 49 U.S.C. § 46110(a), is an order as defined in the Administrative Procedure Act, 5 U.S.C. § 551(6) (Addendum at ADD2-3), namely:

> "the whole or a part of a final disposition . . . of an agency in a matter other than rulemaking" and "final" in the ordinary sense that it mark[s] the consummation of the agency's decisionmaking process, and determine[s] the rights or obligations or give[s] rise to legal consequences. *Safe Extensions, Inc. v. FAA,* 509 F.3d 593, 598 (D.C. Cir. 2007) (internal quotation mark omitted); see also *City of Dania Beach, Fla. v. FAA,* 485 F.3d 1181, 1187-88 (D.C. Cir. 2007); *Vill. of Bensenville v. FAA,* 457 F.3d 52, 68 (D.C. Cir. 2006).

*Id*. As a general principle, "the term 'order' in [section 46110(a)] should be read expansively.'" *City of Dania Beach*, 485 F.3d at 1187. Thus, the fact that an agency's order is in the form of a letter is not determinative of its finality for purposes of judicial review: "an agency may not avoid judicial review merely by choosing the form of a letter." *CSI Aviation v. U.S. Dept. of Transp*., 637 F.3d

408, 412 (D.C. Cir. 2011) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986)).

Under these standards, the letter from Francine Kerner dated October 14, 2015 is a reviewable "order," just as was Ms. Kerner's letter dated January 18, 2013 that engendered the Prior Appeal. The October 14, 2015 Order is the "consummation" of TSA's decision-making process regarding SecurityPoint's contention that TSA should abandon or modify the MOU language. The order also "give[s] rise to legal consequences" by confirming that participating airports will be subject to the Revised MOU Language and thereby affects SecurityPoint's ability to contract with those airports. *See SecurityPoint Holdings*, 769 F.3d at 1187 (citing *Safe Extensions,* 509 F.3d at 598) (holding that an FAA "advisory circular" was reviewable under 49 U.S.C. § 46110(a) where it "effectively … bar[red] manufacturer like [petitioner] from selling their products to airports"). Accordingly, this Court has jurisdiction under 49 U.S.C. § 46110(a).

## II.
## STATEMENT OF ISSUES

1.      Whether the October 14, 2015 Order was arbitrary and capricious, an abuse of discretion, motived by bad faith, or otherwise contrary to law.

2.      Whether the October 14, 2015 Order constitutes improper retaliation in violation of SecurityPoint's rights under the First Amendment to the U.S. Constitution to petition the government for redress of grievances.

## III.
## STATEMENT OF FACTS

### A.     SecurityPoint's Patented Invention.

Every day, thousands of travelers pass through TSA security screening checkpoints at airports across the country.  The passengers load carry-on property into trays taken from carts.  Those trays are passed through X-ray devices that scan for prohibited items, while the passengers themselves pass through a metal detector or a similar device.   After passengers and their property have been screened, passengers collect their property from the trays, and, the trays are stacked on a wheeled cart.  The trays are then moved from the place near where passengers collect their property back to the place near where they loaded their property into trays using a system of wheeled carts.

SecurityPoint is the owner of United States Patent Number 6,888,460 (the "'460 Patent"), issued May 3, 2005, and entitled "Advertising Trays for Security Screening."  (AR Item 8 at 49, JA 165.)  The '460 Patent covers, *inter alia*, the system of wheeled carts used to transport the trays used in the airport security process.  (AR Item 8 at 49, 61-62, JA 165, 177-178; AR Item 19 at 2, JA 62.) SecurityPoint's '460 Patent is used by TSA with SecurityPoint's permission at approximately 40 airports, and without SecurityPoint's permission (and thus in violation of SecurityPoint's patent rights in the '460 Patent) at all others.  (AR Item 19 at 3-4, JA 63-64; AR Item 21, JA 59-60; AR Item 8 at 39, JA 155.)

-4-

**B.**     **The Checkpoint Advertising Program.**

At the airports where TSA practices the '460 Patent with permission, SecurityPoint and the airport operator enter into an agreement whereby SecurityPoint provides its patented method for use by the TSA at the security checkpoints ***free of charge***.  (AR Item 19 at 3, JA 63.)   By virtue of SecurityPoint's agreement with the airport operator, TSA receives an implied license to use the '460 Patent.  (AR Item 19 at 4, JA 64; AR Item 8 at 479, JA 595.)  In exchange, SecurityPoint has the right to place advertisements inside the trays.  (AR Item 19 at 3, JA 63.)   The revenue earned from the advertising is shared between SecurityPoint and the airport operator according to the terms of their contracts.  (AR Item 39 at 3, JA 26.)  This program is referred to herein as the "Checkpoint Advertising Program."

There are clear advantages to both TSA and airport operators of participating in the Checkpoint Advertising Program.   For TSA, the program (i) makes screening more efficient for passengers, (ii) makes screening safer for TSA employees by eliminating much of the physical burden associated with moving the trays throughout the checkpoints, (iii) relieves TSA of the financial obligation of having to purchase trays, carts, and other materials necessary for screening; and (iv) provides TSA a license for the invention covered by the '460 Patent during the period of SecurityPoint's contract with a given local airport.  (AR Item 19 at 4, JA

64; AR Item 39 at 3, JA 26; AR Item 44 at 6, JA 6; AR Item 8 at 479, JA 595.)

Additionally, the Checkpoint Advertising Program frees TSA from having to enter

into contracts directly with SecurityPoint or other private contractors.  (*See id.*)

For airport operators, the Checkpoint Advertising Program generates supplemental

revenue from advertising.  (*See id.*)

To participate in the Checkpoint Advertising Program – and before airport

operators can enter into an agreement with SecurityPoint – TSA requires the

airport operators to enter into a "Memorandum of Understanding" ("MOU") with

TSA.  (AR Item 19 at 3, JA 63; AR Item 39 at 2-7, JA 25-30.)  The MOU governs

the terms of the agreement between TSA and the airport operator which, in turn,

implicates many of the terms of the agreements between SecurityPoint and airport

operators, to which TSA deliberately is not a party.  (*See id.; see also, e.g.*, AR

Item 32 at 1, JA 34.)

The original MOU template was reasonable.  (AR Item 19 at 3-4, JA 63-64;

AR Item 8 at 479, JA 595.)  Prior to August 2012, approximately 40 airports

entered into such MOUs with TSA, and SecurityPoint, in turn, entered into

contracts with those airports to operate the Checkpoint Advertising Program.  (*Id.*;

AR Item 21, JA 59-60.)  As set forth in Section D, below, TSA amended the MOU

in August 2012, adding language that made it impossible for airport operators to

contract with SecurityPoint.  In response to this Court's finding that TSA's

decision to add this language was arbitrary and capricious, TSA added additional language to the MOU in October 2015, and the amended MOU continued to make it difficult, if not impossible, for airport operators to contract with TSA. Indeed, TSA's decision to add this language remains arbitrary and capricious and is contrary to this Court's prior order. TSA's retaliatory conduct against SecurityPoint for filing the Patent Case continues.

## C.    <u>TSA's Infringement Of SecurityPoint's '460 Patent, And The Patent Case.</u>

TSA took more than it was entitled to take under the Checkpoint Advertising Program and implemented SecurityPoint's patented method for moving security trays at hundreds of airports in the United States without SecurityPoint's permission.[3] SecurityPoint receives no compensation from TSA's unauthorized use of the '460 Patent at these airports, whether through license fees or advertising revenues. (AR Item 19 at 4, JA 64.) SecurityPoint thus filed the Patent Case against TSA in the U.S. Court of Federal Claims in May 2011, seeking reasonable compensation for TSA's unlicensed taking of its patented invention. (*SecurityPoint Holdings, Inc. v. United States*, Civil Action No. 1:2011-cv-00268-EGB (Ct. Fed. Claims) (AR Item 8 at 38-46, JA 154-162.)

---

[3] Where TSA uses SecurityPoint's system without its consent, TSA itself provides the trays, carts, and other materials necessary for performing the patented screening method. (AR Item 19 at 4, JA 64).

In the Patent Case, TSA admitted patent infringement (ECF 71 at ¶5), but asserted the defense of patent invalidity due to obviousness pursuant to 35 U.S.C. § 103.

On November 3, 2011, Judge Bruggink entered an order in the Patent Case, which adopted the parties proposal to bifurcate the issues of patent validity and damages.  (ECF 12-14.)

On October 19-28, 2015, Judge Bruggink conducted a trial on TSA's defense of obviousness pursuant to 35 U.S.C. § 103.  The parties completed post-trial briefing on February 17, 2016.  Post-trial arguments were completed May 4, 2016.

### D. **TSA's New MOU Language.**

TSA was unhappy SecurityPoint filed the Patent Case.  In retaliation, TSA demanded that airports agree to drastic changes to the MOU that airports must execute in order to participate in the Checkpoint Advertising Program. Specifically, after the filing of the Patent Case, TSA modified the MOU to (1) "require participating airports to indemnify TSA from all liability for intellectual property claims related to the checkpoint equipment"; and (2) "provide that, on cancellation of an agreement between an airport and a private company, TSA would retain the right to use the checkpoint equipment as well as a license to all

intellectual property necessary for such use." (AR Item 5 at 3, JA 786.) This language is referred to herein as the "New MOU Language."

SecurityPoint opposed these changes and sent several letters to Francine Kerner requesting that TSA "cease and desist from requiring airports to agree to the [N]ew MOU [L]anguage." (*Id*.) Ms. Kerner denied the request in a letter dated January 18, 2013, and SecurityPoint initiated the Prior Appeal. (*Id*. at 4, JA 787)

## E.     **The Prior Appeal.**

The Prior Appeal was argued on September 23, 2014. (*Id*.) During argument, two judges on the panel – Hon. Williams and Henderson – noted the extreme deficiencies in Ms. Kerner's January 18, 2013 Letter:

> JUDGE WILLIAMS: It's not fair to me. I mean, I find the [January 18, 2013] letter one of the most obscure bureaucratic documents I've read in 28 years of reading obscure bureaucratic documents.
>
> MR. KOPPEL: Well, Your Honor --
>
> JUDGE HENDERSON: I agree.

(Supp. AR. at 16., JA 770) [4]

On October 28, 2014, this Court granted SecurityPoint's Petition For Review, and vacated and remanded TSA's January 18, 2013 Order. (AR Item 5 at 8, JA 791). The Court held that Ms. Kerner's January 18, 2013 Order was

---

[4] The September 23, 2014 transcript ("Supp. AR") was the subject of SecurityPoint's motion to supplement the record (ECF Doc. No. 1608173), which document was lodged with this Court on April 11, 2016 at ECF Doc. 1608174.

arbitrary and capricious because it "entirely failed to consider an important aspect of the problem it faces."  (AR Item 5 at 5, 7, JA 788, 790.)  Further, Ms. Kerner's January 18, 2013 Letter failed to "provide any 'basis upon which [the Court] could conclude that it was the product of reasoned decisionmaking.'"  (AR Item 5 at 7, JA 790).

Because the Court agreed with SecurityPoint that the letter was arbitrary and capricious, the Court did not need to, and did not, address SecurityPoint's contention that the letter violated SecurityPoint's First Amendment Rights.  (AR Item 5 at 2, JA 785).

## F.     The Revised MOU Language.

On October 14, 2015—nearly an entire year after this Court held that the January 18, 2013, Order was arbitrary and capricious—TSA issued a new final order.  (AR Item 2, JA 971-1265.)  In this order, TSA made two revisions to the MOU.  Specifically, TSA:

1.     Added the following indemnity option to the indemnification clause:

"Alternatively, the Airport Operator shall require (as an alternative to direct indemnification) in any third-party contract or agreement, that the third-party advertising broker indemnify the Government and its officers . . . ." (AR Item 2 at 10-11, 286, JA 980-981, 1256; AR Item 1, JA 1268.)

2.     Added the following statement to the clause regarding TSA's continued use of the furnishings following termination of the contract:

"TSA shall relinquish all Furnishings delivered under this MOU and any intellectual property required for their use 60 days after TSA receives notice, in writing, from the Airport Operator of the Airport Operator's intent to remove such Furnishings from the checkpoint pursuant to Paragraph 6(B)(3) or on the date the Airport Operator actually removes such Furnishings, whichever occurs later. Such notice is to be delivered to TSA at the address provided in this MOU, unless such notice period is altered or waived in advance and in writing by the FSD."  (AR Item 2 at 2, 284, JA 972, 1254; AR Item 1, JA 1266.)

This language is referred to herein as the "Revised MOU Language".

TSA, in the October 14, 2015 Order, also purported to explain its need for the Revised MOU Language, but, once again, failed to meaningfully address: (1) the fact that indemnification language is unnecessary in view of the implied license (the existence of which TSA does not dispute); (2) that the Revised MOU Language effectively precludes nearly all airport operators from signing the MOU; and (3) that the Revised MOU Language is against TSA's own interests because it prevents TSA from permanently obtaining free checkpoint furnishings. Accordingly, the October 14, 2015 Order is equally as arbitrary and capricious as the January 18, 2013 Order.  Further, TSA's failure to provide any reasoned basis for the New or Revised MOU Language makes clear that the modified MOU Language is nothing more than retaliation against SecurityPoint for filing the Patent Case.

On December 14, 2015, SecurityPoint filed the present petition challenging the October 14, 2015 Order.

-11-

**G.    The Revised MOU Language Continues To Harm SecurityPoint's Business.**

The Revised MOU Language does not alleviate the harm to SecurityPoint's business.  As SecurityPoint argued in the Prior Appeal, nearly-consummated deals that had been negotiated for years fell apart as a direct result of the indemnification provision of the New MOU Language.  (AR Item 19 at 4, 9-11, JA 64, 69-71; AR Item 18 at 1-2, JA 76-77; AR Item 8 at 476-480, JA 592-596.)   TSA does not dispute that the New MOU Language caused at least several major, international airports to cease efforts to implement SecurityPoint's program, including, Atlanta Hartsfield ("ATL"), San Antonio International ("SAT"), and Lambert-St. Louis ("STL").    For example, ATL cancelled efforts to implement SecurityPoint's program after informing SecurityPoint that, "[u]nder Georgia state law, municipalities, such as the City of Atlanta, are not permitted to indemnify anyone because it is considered an impermissible extension of the City's credit to a third party."  (AR Item 8 at 483, JA 599.)  Because ATL could not sign the New MOU Language, it could not contract with SecurityPoint, and a deal negotiated for years was derailed, with the City of Atlanta issuing a letter that expressly stated that "the City is legally precluded from executing the Memorandum of Understanding" with TSA.  (AR Item 18 at 2-3 and Exh. 1 thereto, JA 77-78, 80.)

Further, SecurityPoint was awarded a competitive bid on September 20, 2012, to provide its patented system at SAT, and successfully negotiated and

-12-

completed a commercial agreement with SAT.  (AR Item 19 at 11, JA 71.)  When SAT sent the final executed MOU to TSA for approval (historically a formality), SAT was informed of the New MOU Language.  (*Id.*)  SAT was scheduled to deploy in November 2012, but the program never proceeded.  (*See id.*)

Finally, the New MOU Language halted SecurityPoint's negotiations with STL after more than two years of dealings and with a final contract nearly executed, because STL could not agree to the indemnification provision in the New MOU Language.  (AR Item 19 at 9-10, JA 69-70; AR Item 8 at 477, 480, JA 593, 596.)  SecurityPoint informed TSA of this fact, but TSA again refused to revise the New MOU Language. (AR Item 8 at 476-477, JA 592-593.)  That deal, too, was never consummated.  (*See* AR Item 18 at 2, JA 77.)

TSA does not meaningfully address the issues surrounding these airports in its Final Order dated October 14, 2015, and the Revised MOU Language does not remedy the issues identified by the airport operators concerning the indemnification clause.  (*See* AR Items 1-2, JA 971-1265, 1266-1273.)  Other than a single sentence asserting that the Revised MOU Language addresses a concern raised by ATL, TSA does not argue that the Revised MOU Language will make it easier for airport operators to agree to the MOU.  Indeed, it will not, as evidenced by the fact that TSA has presented no evidence that ATL agreed to the revised language.  Rather, it simply gives the airport operators the "alternative" of trying to

-13-

force an advertising broker to indemnify TSA. To the extent advertising brokers other than SecurityPoint may operate the Checkpoint Advertising Program, TSA provides no explanation of why they would agree to indemnify TSA for TSA's admitted infringement of the '460 Patent or other unidentified patents. Clearly, TSA's inclusion of this language was not the consequence of reasoned decisionmaking on the part of TSA.

**H.   TSA's New MOU Language Was Intended To Retaliate Against SecurityPoint For The Patent Case; The Revised MOU Language Is Continued Retaliation.**

The timeline of events makes the retaliatory intent of TSA clear:

1.   Around 2007, the Checkpoint Advertising Program began, with no indemnification language (AR Item 19 at 3, 8, JA 63, 68; *see* AR Item 43, JA 17-23.)

2.   Beginning around the same time and continuing thereafter, TSA began using the inventions claimed in the '460 Patent at airports that had not executed the MOU (Patent Case, ECF 71 at ¶5);

3.   In May 2011 SecurityPoint filed the complaint in the Patent Case; and

4.   In August 2012, TSA added the new MOU Language, including the indemnification clause (AR Item 8 at 479, JA 595).

In addition, TSA emails show clearly the retaliatory intent of the New MOU Language. Neither the Revised MOU Language nor TSA's efforts to try to justify the revised language change this basic fact. To the contrary, they constitute continued retaliation against SecurityPoint.

-14-

As set forth in SecurityPoint's opening brief in connection with the Prior Appeal, on August 10, 2012, when TSA officially rolled out the New MOU Language, Arthur Drenth, TSA's then-official in charge of disseminating and explaining the New MOU Language nationwide, emailed others at TSA who deal directly with various airports throughout the U.S.   Mr. Drenth provided a paragraph to "address why the changes were made to the MOU" – the ostensible party line:

> TSA continues to support "Security Screening Checkpoint Furnishings" programs as implemented at 41 airports nationwide . . . and encourages such public-private sectors [sic] partnerships when in the agency's best interest.  In the interest of continuing these type of relationships, TSA has revised the template for "Security Screening Checkpoint Furnishings" Memorandum of Understanding (MOU) between the TSA and the Airport Operating Authority (AOA) to address third party intellectual property concerns.  Specifically, the changes to the MOU template address the applicability of third party intellectual property licensing or assertions of infringement, provide for the continued use of "furnishings" provided under the MOU owned by a third party and include language addressing indemnification of the Agency and due diligence by the AOA in its dealings with a third party . . . .

(AR Item 8 at 434, 446 JA 550, 562.)

The remainder of Mr. Drenth's communication, however, made clear that TSA was concerned with only *one* third party – SecurityPoint – and its attempt to enforce its patent rights in the Patent Case.  Specifically, Mr. Drenth asked recipients to "*[v]erbally* inform and discuss" three things with airport operators. (AR Item 8 at 434-435, 446-447, JA 550-551, 562-563 (emphasis in originals).)

He reiterated: "PLEASE NOTE THE REQUEST FURTHER DOWN TO DISCUSS THE 3 ITEMS BELOW (BULLETS) VERBALLY. **IF YOU FWD THIS EMAIL PLEASE DELETE THAT PART FIRST** AND DISCUSS IT VERBALLY WITH THEM." (AR Item 8 at 446, JA 562 (emphasis in original); *see also* AR Item 8 at 434, JA 550.) The three bullet points stated:

- The third-party (SPM) [SecurityPoint] holds a patent covering the use of checkpoint bins and advertising;

- The AOA [Airport Operating Authority] may be inducing the infringement of a patent by TSA and thereby be liable for infringement of a patent owned by a third party, and;

- The financial benefit provided to the AOA by the third-party does not imply a license to the patent owned by the 3rd party, so the AOA may still be liable for patent infringement i.e. the receiving a financial benefit does not also convey a license for use of a method covered by the patent.

(AR Item 8 at 446-447, JA 562-563; *see also* AR Item 8 at 434-435, JA 550-551.)

In response to Mr. Drenth's emails, others at TSA immediately recognized the desired result and likely impact of the New MOU Language – namely, to stop airports from agreeing to the New MOU Language and thus stop them from contracting with SecurityPoint. (*See, e.g*., AR Item 8 at 458, JA 574.) Mr. Drenth then linked the New MOU Language directly to the Patent Case, explaining that the New MOU Language could be avoided if SecurityPoint would grant TSA a nationwide license to use SecurityPoint's patented invention instead of seeking to enforce its patent rights in the Patent Case:

-16-

> My understanding is the entire thing could be resolved if the vendor [SecurityPoint] granted a nationwide license for use of the patent they claim which covers the stacking of bins and the moving of bins on carts. So technically speaking they can claim apparently we are infringing on their "patent" even at airports where the program is not in place and since the patent is unrelated to the actual advertising but "related" to the movement of bins on the carts and the stacking process.
>
> All seems pretty insane but the above is also why we do not want a license "per airport" but a nationwide one. In addition, the "verbal stuff to discuss with them" is to point out the revised MOO [sic] and the airport being licensed by the vendor would protect the airport since currently according to OCC here technically speaking the airport has no license to this "patent" and perhaps could also be sued by SPM as we are already?

(AR Item 8 at 458, JA 574; *see also* AR Item 8 at 455, 461, JA 571, 577.)

Mr. Drenth made similar comments when another TSA official acknowledged that there was "no way" that Boston Logan International Airport ("BOS") would sign the New MOU Language, and that it "throws a wrench into things." (AR Item 24 at 1, 2, JA 48, 49; *see also* AR Item 8 at 458, JA 574 ("My guess is there's no way they will sign this.").) Mr. Drenth explained that TSA nonetheless insisted on the New MOU Language, because:

> These guys from SPM [SecurityPoint] are trying to push the envelope and may have gotten a little ahead of themselves. In my personal opinion it is all a rather silly exercise but we have to draw the line somewhere no matter how much we like the program ***we are not going to be pushed around by them on this stuff***.

(AR Item 8 at 464, JA 580 (emphasis added).)

-17-

Further underscoring TSA's ill intent, Mr. Drenth communicated with Joseph Ambrefe (SecurityPoint's President and CEO) on August 10, 2012 – the same day he instructed others at TSA to discuss the Patent Case only "**_Verbally_**." (AR Item 8 at 434, 446, JA 550, 562 (emphasis in originals).)   Mr. Drenth's communication with Mr. Ambrefe was remarkably different.  He stated, <u>without</u> sending Mr. Ambrefe the New MOU Language, that the "changes [to the MOU] are relatively minor and add some added verbiage on third-party vendors."  (AR Item 8 at 445, JA 561.)

Mr. Drenth – possibly at the direction of others at TSA – feigned ignorance about the relationship between the Patent Case and the New MOU Language when communicating with Mr. Ambrefe.  On August 15, 2012, Mr. Ambrefe explained to Mr. Drenth that the New MOU Language ran "counter to efforts currently under way between SPM and TSA to try to resolve issues relating to SPM's patent rights," and that the New MOU Language, as described above, had negatively impacted – in fact, halted – negotiations with BOS and STL.  (AR Item 8 at 477-478, JA 593-594.)  In response, Mr. Drenth stated, among other things:

> As for the patent issue you reference below, all I can tell you is it is something I am not involved with . . . .  If I was an outsider perhaps I would think the edits are due to some recent action who knows (actions have consequences they say, no?) but again I was told specifically that these edits are related to material that really ought to have been included in the MOU for the very start of the program.

-18-

(AR Item 8 at 476, JA 592 (emphasis added).)[5]

In sum, it is clear TSA was aware of the devastating impact of the New MOU Language on SecurityPoint's ability to contract with airports, but refused to change the New MOU Language in order to retaliate against SecurityPoint and teach it a lesson for "trying to push the envelope" with the Patent Case. In so doing, TSA cut off its proverbial nose to spite its face: by deterring airports from signing MOUs and contracting with SecurityPoint, TSA loses the many benefits that attracted it to the Checkpoint Advertising Program in the first instance. Neither TSA's Revised MOU Language, nor TSA's attempt to try to justify the revised language, change this fact.

## IV.
## SUMMARY OF THE ARGUMENT

SecurityPoint's petition for review should be granted because TSA's October 14, 2015 Order is arbitrary and capricious, as well as contrary to SecurityPoint's First Amendment right to petition the government for redress of grievances.

### A.    TSA's October 14, 2015 Order Is Arbitrary And Capricious.

TSA's October 14, 2015 Order is arbitrary and capricious for three reasons:

---

[5] Mr. Drenth even forwarded his August 15, 2012 emails with Mr. Ambrefe to Mr. Walk – an attorney in TSA's Office of Chief Counsel – as well as other TSA in-house attorneys. (AR Item 8 at 476, JA 592.)

*First*, TSA tries to justify its need for adding indemnification language to the MOU by asserting its fear of patent infringement claims. But, there is no evidence to support TSA's claimed need – purportedly recognized for the first time years after adopting the original MOU – to protect itself from such claims. TSA admitted infringement of the '460 Patent in the Patent Case (ECF 71 at ¶5), and TSA has failed to cite any other intellectual property that it could arguably infringe. A bald statement of fear of patent infringement liability is not sufficient to permit TSA to escape the arbitrary and capricious standard, particularly in view of the history of this matter.

And the Revised MOU Language, which would allow an airport operator to try to shift the indemnification obligation to the advertising broker, would require an advertising broker to indemnify TSA for TSA's admitted infringement of the '460 Patent, which TSA admits could result in damages of $380 million. It is unfathomable to imagine why a third party advertising broker would want to inherent a known, significant liability.

*Second*, in the Order dated October 28, 2014, this Court found that TSA failed to consider the benefits of the Checkpoint Advertising Program, specifically the benefit of receiving free bins, carts and trays. (AR Item 5 at 6, JA 789). TSA responds to this finding by arguing that the cost of equipment SecurityPoint provides under the Checkpoint Advertising Program is not significant. (AR Item 2

at 5-6, JA 975-976.)     This argument does not withstand scrutiny.  TSA's October 14, 2015 Order sets forth the prices of individual bins, carts and tables, but there is no indication in the record that TSA considered the number of bins, carts and tables required at particular airports, the frequency with which bins, carts and tables need to be replaced, or the overall cost of checkpoint equipment at the hundreds of airports around the country.     When these factors are taken into consideration, there is a substantial, realized cost-savings that would be enjoyed by the TSA under the Checkpoint Advertising Program.  (*See*, *e.g.*, AR Item 44 at 5-6, JA 5-6 (TSA "Frequently Asked Questions" document explaining that analysis showed a cost savings to TSA that, for the **eighteen-month** pilot project of the Checkpoint Advertising Program involving only **fourteen airports**, amounted to **$435,500**).)

The Order dated October 14, 2015, further failed to address the other benefits of the Checkpoint Advertising Program, including the reduction of work-related injuries among Transportation Security Officers and "efficiency gains" at no cost to TSA and the presentation of a "clean, consistent checkpoint appearance."  (AR Item 44 at 6, JA 6 ; AR Item 45 at 3, JA 9).

*Third*, TSA argues that the New MOU Language is not arbitrary and capricious because some airports have agreed to it.  (AR Item 2 at 5, JA 975.)  But, as the Court found in the October 28, 2014 Order, this argument is insufficient.  As

an initial matter, the Checkpoint Advertising Program is not operating at BOS, and TSA presented no evidence that it is.  The other airports TSA contends have agreed to the New MOU Language are *de minimis non curat lex,* as this Court noted in its October 28, 2014 Order.  (AR Item 5 at 7, JA 790).  It remains undisputed that the overwhelming majority of U.S. airports have not executed the MOU with the New or Revised MOU Language.  And TSA has presented no evidence that even a single airport has actually been added to the Checkpoint Advertising Program since the MOU language was modified.

### B.   TSA's October 14, 2015 Order Is Contrary To SecurityPoint's First Amendment Rights.

In addition to being arbitrary and capricious, TSA's October 14, 2015 Order is contrary to SecurityPoint's First Amendment right to petition the government for redress of grievances, because TSA retaliated against SecurityPoint for protected speech.  Arthur Drenth – the then Manager of the Checkpoint Advertising Program – sent numerous internal emails that make abundantly clear that TSA implemented the New MOU Language in retaliation for the Patent Case, which is undeniably petitioning activity protected by the First Amendment.  TSA does not deny Mr. Drenth's emails, but instead tries to distance itself from Mr. Drenth.  This effort is a tacit admission that the emails show retaliatory intent.  TSA also argues that Mr. Drenth was mistaken in his emails, because he was not knowledgeable about the reasons for the changes to the MOU.  This argument is not plausible, and, even if

credited, simply shows that TSA changed the MOU language without considering important aspects of the problem it faced and without informing with key personnel, thereby rendering the decision arbitrary and capricious.  (*See* AR Item 5 at 5, JA 788 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).)

The case law establishes that, in cases like this one, where the exercise of First Amendment rights leads to significant economic injury, future First Amendment activity will likely be chilled.  *Powell v. Alexander*, 391 F.3d 1, 16-17 (1st Cir. 2004) (recognizing that the threat of retaliatory action, including "actual economic injury following the filing or pursuit of grievances" can chill a person's exercise of First Amendment rights).  Thus, SecurityPoint can establish that TSA, in implementing the New MOU Language, followed by the Revised MOU Language, retaliated against it in violation of SecurityPoint's First Amendment Rights.

## V.
## SECURITYPOINT'S STANDING

SecurityPoint has standing to challenge TSA's October 14, 2015 Order because the Revised MOU Language imposes direct obligations and consequences on SecurityPoint.  As noted above, the Revised MOU Language requires airport operators or advertising brokers to indemnify TSA for TSA's violation of others' intellectual property rights. (AR Item 2, JA 971-1265.)  This provision effectively

prevents SecurityPoint from entering into additional agreements with airport operators, causing direct and redressable injury in fact to SecurityPoint sufficient to confer standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

## VI.
## ARGUMENT

**A.    SecurityPoint's Petition For Review Meets The Legal Standard For Showing TSA's Decision Should Be Set Aside As Arbitrary And Capricious And A Violation Of SecurityPoint's First Amendment Rights.**

An agency decision must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (Addendum at ADD5).  The court's "inquiry into the facts is to be searching and careful," reflecting "a thorough, probing, in-depth review."  *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  A decision is arbitrary and capricious and must be set aside if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

An agency determination must similarly be set aside where it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B) (Addendum at ADD5); *see also Citizens To Preserve Overton Park v. Volpe*, 401

-24-

U.S. at 413-414 ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.").   This Court "'should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making" because a court does "not give [an agency's] actions the usual deference when reviewing a potential violation of a constitutional right.'"   *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979).)

TSA's October 14, 2015 Order must be set aside because it is (1) arbitrary and capricious, and (2) contrary to SecurityPoint's First Amendment right to petition the government for redress of grievances.

**B.** **There Is No Evidence To Support TSA's Claimed Need To Protect Itself From Patent Infringement Claims.**

TSA's primary argument in its October 14, 2015 Order is that the New and Revised MOU Language resulted from reasoned decisionmaking because it is necessary to protect TSA from patent infringement claims.   (AR Item 2 at 4, JA 974).   This argument is implausible on its face, and demonstrates TSA's retaliatory intent.

TSA already admitted infringement of the '460 Patent in the Patent Case. (ECF 71 at ¶5.)   The New and Revised MOU Language purports to require airport

-25-

operators or advertising brokers to indemnify TSA for infringement of the '460

Patent, despite:

- TSA admitted it infringes the '460 Patent;

- The trial of the validity of the '460 Patent already occurred, leaving an airport operator limited opportunities to challenge the patent; and

- TSA has acknowledged that damages for infringement of the '460 Patent could potentially be $380 million (AR Item 2 at 4, JA 974).

Obviously, few if any airport operators or advertising brokers would agree to an

indemnity provision under these circumstances.

Even more egregious, the Revised MOU Language would purport to require

airport operators or advertising brokers to indemnify TSA for a patent that TSA

alone can directly infringe. Each and every claim of the '460 Patent claims a

***method*** used in security screening checkpoints. (AR Item 8 at 65, JA 181.)  TSA

alone controls the *methods* used at security screening checkpoints.  49 U.S. Code

§§ 44901(a), (b) ("All screening of passengers and property at airports in the

United States where screening is required under this section shall be supervised by

uniformed Federal personnel of the Transportation Security Administration who

shall have the power to order the dismissal of any individual performing such

screening.") (Addendum at ADD25).  Airport operators have no control over the

methods that are used at security screening checkpoints.  *See id*.  Clearly, airport

operators or advertising brokers would be understandably reluctant to agree to indemnify TSA for a patent that TSA alone can directly infringe.

In its October 14, 2015 Order, TSA tries to sidestep this issue by arguing that airport operators provide bins, carts and tables that TSA uses at checkpoints, and therefore should be liable for infringement of patents covering these components. (AR Item 2 at 3, 6-7, JA 973, 976-977). But, as noted above, the '460 Patent claims a ***method*** that is performed by TSA personnel. TSA further argues that certain bins, carts and tables may infringe some ***unspecified and unknown patents***, thereby forcing TSA to require indemnification from airport operators or brokers. (*Id*.) But TSA does not assert that it made any evaluation of whether such patents actually exist before it made its decision to add the New or Revised MOU Language and shut SecurityPoint out of the market. Nor does TSA explain why the risk of patent infringement liability would be greater with respect to equipment provided by an advertising broker than it would be for equipment TSA purchased directly. Indeed, there is no reason it would be, and TSA does not argue that it conducted an evaluation of whether the equipment it purchases directly infringes any patents.

Further, the infringement risk of unspecified patents existed prior to the filing of the Patent Case, but yet did not prompt TSA to modify the MOU at that time. TSA argues that new IP counsel prompted the modifications to the MOU.

-27-

But, the declarations of this IP counsel were before the Court in the Prior Appeal, and were not deemed sufficient to persuade the Court that TSA's actions resulted from reasoned decisionmaking.

Finally, in the October 28, 2014 Order in the Prior Appeal, this Court found that TSA had failed to even consider SecurityPoint's contention that the MOU constituted an implied license to the '460 Patent, protecting TSA from infringement claims. (AR Item 5 at 7, JA 790.) Despite this finding, TSA again ignored the existence of an implied license in its October 14, 2015 Order. Indeed, TSA failed to set forth a position one way or the other about whether the MOU constitutes an implied license to the '460 Patent. Instead, TSA avoided the issue by arguing that the '460 Patent may not be the only intellectual property implicated by the Bin Advertising Program. As set forth above, in the absence of any intellectual property analysis or reasonable fear that other intellectual property may exist, TSA's explanation rings hollow.

TSA's bald assertion of "real potential for patent liability" is not sufficient to qualify as reasoned decisionmaking that is not arbitrary and capricious. Indeed, in the Prior Appeal, this Court was not persuaded by Ms. Kerner's assertion that "TSA modified the MOU in order to 'protect itself from legal liability'". (AR Item 5 at 7, JA 790.) The same should be the case in the present appeal.

**C.** **TSA's Assertion That The Cost Of Equipment Securitypoint Provides Under The Checkpoint Advertising Program Is Not Significant Does Not Withstand Scrutiny.**

In the Order dated October 28, 2014, this Court found that TSA's final decision to adopt the New MOU Language was arbitrary and capricious because "[i]t offers no indication that [Ms. Kerner] or anyone at TSA even considered the potential harms to the Bin Advertising Program, and thus to TSA, from insistence on the new provisions, such as the additional equipment costs that would shift back to the agency as a result." (AR Item 5 at 6, JA 789). Upon remand, TSA attempted to justify its decision by asserting that the "bins, carts and tables are fairly inexpensive to purchase." (AR Item 2 at 5, JA 975). To try to support this justification, TSA noted the price of individual items, such as $6.30 for a bin, $69.97 for a cart, and $317.00 for a table. (AR Item 2 at 5-6, JA 975-976.)

The October 14, 2015 Order, however, fails to indicate that TSA gave any consideration to the total equipment cost savings that would have resulted from implementation of the Checkpoint Advertising Program. For example, TSA failed to consider the number of times bins, carts and tables need to be replaced, the total number of bins, carts and tables needed at each airport, or the overall cost of bins, carts and tables at the hundreds of airports around the country. Indeed, the evidence in the record indicates that the overall costs would be substantial. (*See* AR Item 44 at 5-6, JA 5-6 (TSA "Frequently Asked Questions" document

-29-

explaining that analysis showed a cost savings to TSA that, for the **eighteen-month** pilot project of the Checkpoint Advertising Program involving only **fourteen airports**, amounted to **$435,500**).)  In the absence of any consideration of the overall costs, it is clear TSA "'failed to consider an important aspect of the problem' it faces."  (AR Item 5 at 5, JA 788 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).)

Furthermore, the Order dated October 14, 2015 failed to address the other benefits of the Checkpoint Advertising Program, including the reduction of work-related injuries among Transportation Security Officers, the "efficiency gains" at no cost to TSA, and the presentation of a "clean, consistent checkpoint appearance."  (AR Item 44 at 6, JA 6; AR Item 45 at 3, JA 9.)

## D.    TSA's Attempt To Argue That Some Airports Are Able To Agree To The Revised MOU Language Is Insufficient.

TSA completely ignored the fact that many airport operators are prohibited by law from entering into indemnity agreements.  For example, ATL informed TSA that "[u]nder Georgia state law, municipalities, such as the City of Atlanta, are not permitted to indemnify anyone because it is considered an impermissible extension of the City's credit to a third party" (AR Item 8 at 483, JA 599), and TSA received a letter from the City of Atlanta explaining that "the City is legally precluded from executing the Memorandum of Understanding" with TSA (AR Item 18 at Exh. 1 thereto, JA 80).  SJC similarly informed TSA of its inability to

execute the MOU because of the New MOU Language regarding indemnification. (AR Item 8 at 491, 495, JA 607, 611; *see also* AR Item 8 at 486, 502, 507, 516, 523, JA 602, 618, 623, 632, 639.)  TSA ignored these airports' concerns, forfeiting participation in the Checkpoint Advertising Program by those airports – as well as other airports – and the accompanying increased efficiencies and economic benefits that would attend SecurityPoint's contracts with those airports.  (*See* AR Items 19 at 9-12 (JA 69-72) and 18 at 1-3 (JA 76-78); *see also* AR Item 8 at 479, JA 595.)

TSA's only response to these undisputed facts is that a few, mostly small, airports did agree to sign MOU's with indemnification language.  (AR Item 2 at 5, JA 975.)  But there is no evidence in the record that the Checkpoint Advertising Program is actually in place at any of these airports.  Indeed, the Checkpoint Advertising Program is not in place at BOS, and TSA has presented no evidence that it is.  With respect to the three other airports TSA cites in its October 14, 2015 Order (Greater Rochester (ROC), Rochester International (RST), and Durango La-Plata (DRO)), these are small airports that fit squarely within this Court's finding of *de minimis non curat lex* in its October 28, 2014 Order.  (*See* AR Item 5 at 7, JA 790.)  Three small airports out of the more than four hundred U.S. Airports certainly do not support the reasonableness of TSA's Revised MOU Language.

-31-

**E.    TSA's Implementation Of The New and Revised MOU Language Is Not The Result Of Reasoned Decisionmaking, But Rather Is An Effort To Retaliate Against SecurityPoint For Filing The Patent Case.**

In the October 28, 2014 Order in the Prior Appeal, the Court found that TSA's decision to insert the New MOU Language was arbitrary and capricious. (AR Item 5 at 7, JA 790.)   Accordingly, the Court did not need to reach SecurityPoint's argument that TSA's insertion of the New MOU Language violated SecurityPoint's First Amendment rights because TSA inserted the language to harm SecurityPoint in retaliation for filing the Patent Case.  (AR Item 5 at 2, JA 785.)  TSA's Order dated October 14, 2015, which, as set forth above, fails to set forth any reasoned justification for the New MOU Language, confirms that TSA inserted the language in retaliation against SecurityPoint.   TSA's insertion of the additional, Revised MOU Language, fails to ameliorate the retaliation, but rather confirms it.

**1.    The Legal Standard.**

The right to petition the government for the redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected . . . with the other First Amendment rights of free speech and free press."  *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967).  The right to petition the government encompasses a wide range of activity, including litigation against the government: "our constitutional system

-32-

gives every citizen the right to seek redress in the courts . . . without fear that recourse to the law will make that citizen a target for [government] retaliation." *Powell*, 391 F.3d at 16.

As a logical extension of the right to petition, the government is constitutionally prohibited from retaliating against a party that brings suit against it, and such retaliation itself constitutes an unlawful violation of the First Amendment. *Holzemer v. City of Memphis*, 621 F.3d 512, 776 (6th Cir. 2010) ("[G]overnment retaliation for filing a petition violates the literal language of the Petition Clause.")(*quoting Gable v. Lewis*, 201 F.3d 769, 772 (6th Cir. 2000)); *Tuccio v. Marconi*, 589 F.3d 538, 541 (2nd Cir. 2009) ("To be sure, our constitutional doctrine prohibits government officials from punitive retaliation against persons who exercise their First Amendment right to sue the government."); *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986) ("[S]tate officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future.").

-33-

To establish unlawful retaliation, a plaintiff must demonstrate that (i) it "engaged in activity protected by the First Amendment;" (ii) the government's retaliatory actions "would likely deter First Amendment activity in the future;" and (iii) the "First Amendment activity was a [sic] 'at least a motivating factor' in the [government's] decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (*quoting Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)); *see also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*, 921 F. Supp. 2d 1137, 1187-88 (D.N.M. 2013) ("To establish a claim for retaliation, outside the employment context, for exercising the right to [petition] guaranteed under the First Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the [government's] actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the [government's] adverse action."). SecurityPoint easily meets this test.

### 2.    The Patent Case Is Protected Petitioning Activity.

The Patent Case is undeniably petitioning activity protected by the First Amendment. *De Valle Group v. Puerto Rico Ports Authority*, 756 F. Supp. 2d 169, 179-84 (D.P.R. 2010) (litigation against the government implicates the right to seek the redress of grievances granted in the First Amendment); *see also Woodruff*,

542 F.3d at 551 ("The First Amendment right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular.") (*citing California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) and *NAACP v. Button*, 371 U.S. 415, 429-30 (1963)).

### 3.     TSA's Retaliation Will Likely Chill Future First Amendment Activity.

As the First Circuit has recognized, a wide range of negative consequences resulting from retaliatory action can chill a person's exercise of First Amendment rights, including the threat of "negative treatment" and "actual economic injury following the filing or pursuit of grievances." *Powell*, 391 F.3d at 17 (internal citations omitted).  Here, SecurityPoint has suffered "negative treatment" and "actual economic injury" as a direct result of TSA's retaliatory implementation of the New MOU Language, in the form of lost contracts and business with ATL, STL, BOS, SAT, and SJC.  (*See* AR Item 19 at 9-12, JA 69-72; AR Item 18 at 2, JA 77.)  Such losses are more than sufficient to demonstrate the likely chilling effect of TSA's actions.

Several courts recognized that similar economic injuries give rise to a claim for retaliation.  For example, in *Holzemer*, the court determined that the plaintiff company had presented a sufficiently colorable claim of chilled speech to defeat summary judgment where it asserted that the government, in retaliation for complaints made by the company to government officials, delayed in granting the

-35-

company necessary permits to engage in business.  621 F.3d at 520.  Similarly, in

*Jarita Mesa Livestock Grazing Ass'n*, the court determined that the United States

Forest Service's reduction in the number and scope of permits granted to a cattle

grazing association in retaliation for the association's complaints to New Mexico's

governor and congressmen about the Forest Service gave rise to a colorable claim

of chilled speech.  921 F. Supp. 2d at 1187-88.  Finally, in *De Valle Group*, the

court found chilled speech where the government rejected the lowest bidder for a

project because it had filed a lawsuit against the government.  756 F. Supp. 2d at

180-82; *see also Woodruff*, 542 F.3d at 551 (plaintiff could have had cognizable

claim that the government violated the First Amendment if plaintiff could prove

that after plaintiff brought suit against the Indiana Family and Social Services

Administration (FSSA), the FSSA allegedly retaliated by interfering with one of

the plaintiff's contractual relationships).  Just as the facts in *Holzemer, Jarita Mesa*

*Livestock Grazing Ass'n,* and *Woodruff* were sufficient to give rise to a finding of

chilled speech, so too is TSA's implementation of the New MOU Language.

### 4.    <u>The Patent Case Was A Motivating Factor In TSA's Actions.</u>

As described in detail above, the Patent Case was a motivating factor in

TSA's implementation of the New MOU Language.  Mr. Drenth – the TSA official

charged with rolling out the New MOU Language – expressly linked that New

MOU Language to the Patent Case.  (AR Item 8 at 434-435, 446-447, JA 550-551,

562-563.)  He told others at TSA to explain to local airports "*[v]erbally*" about SecurityPoint's patent and to suggest – falsely – that they might be liable to SecurityPoint for patent infringement, even while participating in the Checkpoint Advertising Program.  (*Id*. (emphasis in original).)  Mr. Drenth additionally stated, in reference to the New MOU Language, that "the entire thing could be resolved if the vendor [SecurityPoint] granted a nationwide license for use of the patent they claim which covers the stacking of bins and the moving of bins on carts."  (AR Item 8 at 458, JA 574.)  He similarly stated that, by filing the Patent Case, "These guys from SPM [SecurityPoint] are trying to push the envelope and may have gotten a little ahead of themselves. . . . *we are not going to be pushed around by them on this stuff*."  (AR Item 8 at 464, JA 580 (emphasis added).)

The fact that TSA now attempts to justify the New MOU Language is immaterial.  First, as explained above, there is no evidence in the record to support the assertion that the modified language resulted from reasoned decisionmaking.  In fact, the evidence uniformly suggests that TSA implemented the New MOU Language to retaliate against SecurityPoint.  Indeed, the threat of an infringement risk existed well before the filing of the Patent Case, but yet the TSA took no action to revise the MOU until after the Patent Case was filed.  Second, even if TSA could have implemented the New MOU Language based on reasoned decisionmaking, that fact does not change the retaliation analysis.  *Matzker v.*

*Herr*, 748 F.2d 1142, 1150-51 (7th Cir. 1984) ("An act taken in retaliation for the exercise of a constitutionally protected right is [unlawful] even if the act, when taken for a different reason, would have been proper.").

Thus, regardless of TSA's asserted post-hoc justification, the New MOU Language constitutes a violation of SecurityPoint's First Amendment rights. TSA's insertion of The Revised MOU Language, which does nothing to ameliorate the harm to SecurityPoint, makes clear that TSA is continuing to retaliate against SecurityPoint.

### 5.    <u>TSA's Attempt To Distance Itself From Mr. Drenth Is A Tacit Admission That He Admitted Retaliatory Intent.</u>

Mr. Drenth was the Manager of the Checkpoint Advertising Program at the time of the events in question. (*See* AR Item 8 at 434-435, 445, 446-447, 476-477, JA 550-551, 561, 562-563, 592-593.)   As set forth above, he sent numerous internal emails to TSA personnel in which he acknowledged TSA's retaliatory intent.  These communications include:

- Mr. Drenth's August 10, 2012 internal emails, in which he asked recipients to "*[v]erbally* inform" local airports about SecurityPoint's patent, and to state that those airports might be liable to SecurityPoint for patent infringement, even if they contract with SecurityPoint, thereby obtaining an implied license to practice the '460 Patent (AR Item 8 at 434-435, 446-447, JA 550-551, 562-563 (emphasis in originals));

- Mr. Drenth's August 10, 2012 internal communication that "My understanding is the entire thing could be resolved if the vendor [SecurityPoint] granted a nationwide license for use of the patent they

-38-

claim which covers the stacking of bins and the moving of bins on carts. . . ."  (AR Item 8 at 458, JA 574);

- Mr. Drenth's August 10, 2012 internal communication that "These guys from SPM [SecurityPoint] are trying to push the envelope and may have gotten a little ahead of themselves . . . *we are not going to be pushed around by them on this stuff* . . . ." (AR Item 8 at 464, JA 580 (emphasis added));

- Mr. Drenth's external communications with Mr. Ambrefe of SecurityPoint, which contrast markedly to Mr. Drenth's internal communications with TSA (AR Item 8 at 434-435, 445, 446-447, 476-477, JA 550-551, 561, 562-563);

- Mr. Drenth's frequent communications with Mr. Walk, TSA's counsel in the Patent Case during the relevant time period, and other TSA in-house attorneys (AR Item 8 at 476, JA 592; *see also* AR Item 8 at 587-599, JA 703-715 (privilege log that reflects numerous August 10-15, 2012 communications between Mr. Drenth and TSA's Office of the Chief Counsel)).

In its October 14, 2015 Order, TSA argues that Mr. Drenth's statements should not be credited.  Rather, TSA argues that Mr. Drenth simply "implemented the revised MOU based on instructions from the Office of Chief Counsel" and he "had no involvement in formulating or drafting the revisions."  (AR Item 2 at 9, JA 979).  TSA's attempt to distance itself from Mr. Drenth is unavailing; rather, it is a tacit admission that Mr. Drenth admitted TSA's retaliatory intent in his internal email communications.

Significantly, TSA fails to support its bald assertion that Mr. Drenth "had no direct knowledge of what motivated TSA to revise the MOU." (*Id.*)  TSA fails to

provide an affidavit from Mr. Drenth, or even indicate that it spoke to Mr. Drenth before issuing its October 14, 2015 Order.

Moreover, TSA argues that the Office of Chief Counsel directed the changes to the MOU without seeking any input from Mr. Drenth.  (*Id.*)  Even if this was the case, it fails to support TSA's argument that it did not act with retaliatory intent.  Rather, it shows that the Office of Chief Counsel deliberately kept the manager of the program in the dark.  And it further demonstrates that TSA implemented the MOU language without seeking input from the manager of the program – which would necessarily mean that TSA acted without considering an important aspect of the problem it faced.  (*See* AR Item 5 at 5, 7, JA 790.)

Finally, TSA's assertion that the Office of the Chief Counsel implemented the revised MOU language based on a finding that the original MOU "did not contain sufficient intellectual property protections" is nothing more than a smokescreen.  (AR Item 2 at 9, JA 979.)  As set forth above, TSA fails to explain why it would be reasonable to expect airport operators or advertising brokers to indemnify TSA for infringement of a patent TSA already admitted it infringes and for which TSA admits damages could potentially be $380 million.  Nor does TSA take the position that it conducted an intellectual property review of any type to determine the reasonableness of its assertion that carts, trays or tables – by themselves – might be covered by any patent.  Nor does TSA explain why it would

be at greater risk of infringing patents covering equipment provided by an advertising broker than equipment TSA purchased directly.  In the absence of any such analysis, TSA's bald assertion that it feared patent liability cannot outweigh the clear statements in Mr. Drenth's emails.

### VII.
### CONCLUSION

For the reasons explained above, SecurityPoint respectfully requests that the Court grant its petition for review.

Respectfully submitted,

/s/ Bradley C. Graveline
Bradley C. Graveline
Manish K. Mehta
Sheppard Mullin Richter & Hampton LLP
70 West Madison Street, 48th Floor
Chicago, IL 60602-4498
Tel.:  312-499-6316
Fax:  312-499-4735
Email:  bgraveline@sheppardmullin.com
          mmehta@sheppardmullin.com

Laura M. Burson
Sheppard Mullin Richter & Hampton LLP
333 S. Hope St., 43rd Floor
Los Angeles, CA  90071
Tel.:  213-617-5527
Fax:  213-443-2794
Email:  lburson@sheppardmullin.com

Counsel for Petitioner SecurityPoint Holdings, Inc

Dated:  August 9, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief consists of 9,949 words, excepting those portions of the brief excluded by Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. R. 32(a)(7)(B).  I hereby further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman Font.

/s/ Bradley Graveline
Bradley Graveline

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2016, I caused to be electronically filed the foregoing pleading with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.


<u>/s/ Bradley Graveline</u>
Bradley Graveline

# **ADDENDUM**

Amendment I. Freedom of Religion, Speech and Press;..., USCA CONST Amend....

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment I. Freedom of Religion, Speech and Press; Peaceful Assemblage; Petition of Grievances
      (Refs & Annos)

### U.S.C.A. Const. Amend. I-Full Text

Amendment I. Freedom of Religion, Speech and Press; Peaceful Assemblage; Petition of Grievances

Currentness

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

<This amendment is further displayed in three separate documents according to subject matter>

<see USCA Const Amend. I, Religion>

<see USCA Const Amend. I, Speech>

<see USCA Const Amend. I, Assemblage>

U.S.C.A. Const. Amend. I-Full Text, USCA CONST Amend. I-Full Text
Current through P.L. 113-47 approved 10-31-13

End of Document                © 2013 Thomson Reuters. No claim to original U.S. Government Works.

ADD1

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 5. Administrative Procedure (Refs & Annos)
        Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 551

§ 551. Definitions

Effective: January 4, 2011

Currentness

For the purpose of this subchapter--

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title--

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix;

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be

§ 551. Definitions, 5 USCA § 551

admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency--

   (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

   (B) withholding of relief;

   (C) imposition of penalty or fine;

   (D) destruction, taking, seizure, or withholding of property;

   (E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

   (F) requirement, revocation, or suspension of a license; or

   (G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency--

   (A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 551. Definitions, 5 USCA § 551

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 381; Pub.L. 94-409, § 4(b), Sept. 13, 1976, 90 Stat. 1247; Pub.L. 103-272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub.L. 111-350, § 5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

Notes of Decisions (242)

5 U.S.C.A. § 551, 5 USCA § 551
Current through P.L. 113-47 approved 10-31-13

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 706. Scope of review, 5 USCA § 706

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
      Part I. The Agencies Generally
        Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**
(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (3312)

ADD5

§ 706. Scope of review, 5 USCA § 706

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 113-47 approved 10-31-13

End of Document                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

ADD6

§ 114. Transportation Security Administration, 49 USCA § 114

United States Code Annotated
   Title 49. Transportation (Refs & Annos)
      Subtitle I. Department of Transportation
         Chapter 1. Organization (Refs & Annos)

49 U.S.C.A. § 114

§ 114. Transportation Security Administration

Effective: October 28, 2009

Currentness

(a) **In general.**--The Transportation Security Administration shall be an administration of the Department of Transportation.

(b) **Under Secretary.**--

  (1) **Appointment.**--The head of the Administration shall be the Under Secretary of Transportation for Security. The Under Secretary shall be appointed by the President, by and with the advice and consent of the Senate.

  (2) **Qualifications.**--The Under Secretary must--

    (A) be a citizen of the United States; and

    (B) have experience in a field directly related to transportation or security.

  (3) **Term.**--The term of office of an individual appointed as the Under Secretary shall be 5 years.

(c) **Limitation on ownership of stocks and bonds.**--The Under Secretary may not own stock in or bonds of a transportation or security enterprise or an enterprise that makes equipment that could be used for security purposes.

(d) **Functions.**--The Under Secretary shall be responsible for security in all modes of transportation, including--

  (1) carrying out chapter 449, relating to civil aviation security, and related research and development activities; and

  (2) security responsibilities over other modes of transportation that are exercised by the Department of Transportation.

(e) **Screening operations.**--The Under Secretary shall--

  (1) be responsible for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation under sections 44901 and 44935;

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 114. Transportation Security Administration, 49 USCA § 114

(2) develop standards for the hiring and retention of security screening personnel;

(3) train and test security screening personnel; and

(4) be responsible for hiring and training personnel to provide security screening at all airports in the United States where screening is required under section 44901, in consultation with the Secretary of Transportation and the heads of other appropriate Federal agencies and departments.

(f) **Additional duties and powers.**--In addition to carrying out the functions specified in subsections (d) and (e), the Under Secretary shall--

(1) receive, assess, and distribute intelligence information related to transportation security;

(2) assess threats to transportation;

(3) develop policies, strategies, and plans for dealing with threats to transportation security;

(4) make other plans related to transportation security, including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States Government;

(5) serve as the primary liaison for transportation security to the intelligence and law enforcement communities;

(6) on a day-to-day basis, manage and provide operational guidance to the field security resources of the Administration, including Federal Security Managers as provided by section 44933;

(7) enforce security-related regulations and requirements;

(8) identify and undertake research and development activities necessary to enhance transportation security;

(9) inspect, maintain, and test security facilities, equipment, and systems;

(10) ensure the adequacy of security measures for the transportation of cargo;

(11) oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities;

(12) require background checks for airport security screening personnel, individuals with access to secure areas of airports, and other transportation security personnel;

(13) work in conjunction with the Administrator of the Federal Aviation Administration with respect to any actions or activities that may affect aviation safety or air carrier operations;

(14) work with the International Civil Aviation Organization and appropriate aeronautic authorities of foreign governments under section 44907 to address security concerns on passenger flights by foreign air carriers in foreign air transportation; and

(15) carry out such other duties, and exercise such other powers, relating to transportation security as the Under Secretary considers appropriate, to the extent authorized by law.

(g) **National emergency responsibilities.--**

(1) **In general.--**Subject to the direction and control of the Secretary, the Under Secretary, during a national emergency, shall have the following responsibilities:

(A) To coordinate domestic transportation, including aviation, rail, and other surface transportation, and maritime transportation (including port security).

(B) To coordinate and oversee the transportation-related responsibilities of other departments and agencies of the Federal Government other than the Department of Defense and the military departments.

(C) To coordinate and provide notice to other departments and agencies of the Federal Government, and appropriate agencies of State and local governments, including departments and agencies for transportation, law enforcement, and border control, about threats to transportation.

(D) To carry out such other duties, and exercise such other powers, relating to transportation during a national emergency as the Secretary shall prescribe.

(2) **Authority of other departments and agencies.--**The authority of the Under Secretary under this subsection shall not supersede the authority of any other department or agency of the Federal Government under law with respect to transportation or transportation-related matters, whether or not during a national emergency.

(3) **Circumstances.--**The Secretary shall prescribe the circumstances constituting a national emergency for purposes of this subsection.

(h) **Management of security information.--**In consultation with the Transportation Security Oversight Board, the Under Secretary shall--

(1) enter into memoranda of understanding with Federal agencies or other entities to share or otherwise cross-check as necessary data on individuals identified on Federal agency databases who may pose a risk to transportation or national security;

(2) establish procedures for notifying the Administrator of the Federal Aviation Administration, appropriate State and local

ADD9

law enforcement officials, and airport or airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety;

(3) in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers--

(A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and

(B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual; and

(4) consider requiring passenger air carriers to share passenger lists with appropriate Federal agencies for the purpose of identifying individuals who may pose a threat to aviation safety or national security.

(i) **View of NTSB.**--In taking any action under this section that could affect safety, the Under Secretary shall give great weight to the timely views of the National Transportation Safety Board.

(j) **Acquisitions.**--

(1) **In general.**--The Under Secretary is authorized--

(A) to acquire (by purchase, lease, condemnation, or otherwise) such real property, or any interest therein, within and outside the continental United States, as the Under Secretary considers necessary;

(B) to acquire (by purchase, lease, condemnation, or otherwise) and to construct, repair, operate, and maintain such personal property (including office space and patents), or any interest therein, within and outside the continental United States, as the Under Secretary considers necessary;

(C) to lease to others such real and personal property and to provide by contract or otherwise for necessary facilities for the welfare of its employees and to acquire, maintain, and operate equipment for these facilities;

(D) to acquire services, including such personal services as the Secretary determines necessary, and to acquire (by purchase, lease, condemnation, or otherwise) and to construct, repair, operate, and maintain research and testing sites and facilities; and

(E) in cooperation with the Administrator of the Federal Aviation Administration, to utilize the research and development facilities of the Federal Aviation Administration.

(2) **Title.**--Title to any property or interest therein acquired pursuant to this subsection shall be held by the Government of the United States.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 114. Transportation Security Administration, 49 USCA § 114

(k) **Transfers of funds.**--The Under Secretary is authorized to accept transfers of unobligated balances and unexpended balances of funds appropriated to other Federal agencies (as such term is defined in section 551(1) of title 5) to carry out functions transferred, on or after the date of enactment of the Aviation and Transportation Security Act, by law to the Under Secretary.

(l) **Regulations.**--

(1) **In general.**--The Under Secretary is authorized to issue, rescind, and revise such regulations as are necessary to carry out the functions of the Administration.

(2) **Emergency procedures.**--

(A) **In general.**--Notwithstanding any other provision of law or executive order (including an executive order requiring a cost-benefit analysis), if the Under Secretary determines that a regulation or security directive must be issued immediately in order to protect transportation security, the Under Secretary shall issue the regulation or security directive without providing notice or an opportunity for comment and without prior approval of the Secretary.

(B) **Review by Transportation Security Oversight Board.**--Any regulation or security directive issued under this paragraph shall be subject to review by the Transportation Security Oversight Board established under section 115. Any regulation or security directive issued under this paragraph shall remain effective for a period not to exceed 90 days unless ratified or disapproved by the Board or rescinded by the Under Secretary.

(3) **Factors to consider.**--In determining whether to issue, rescind, or revise a regulation under this section, the Under Secretary shall consider, as a factor in the final determination, whether the costs of the regulation are excessive in relation to the enhancement of security the regulation will provide. The Under Secretary may waive requirements for an analysis that estimates the number of lives that will be saved by the regulation and the monetary value of such lives if the Under Secretary determines that it is not feasible to make such an estimate.

(4) **Airworthiness objections by FAA.**--

(A) **In general.**--The Under Secretary shall not take an aviation security action under this title if the Administrator of the Federal Aviation Administration notifies the Under Secretary that the action could adversely affect the airworthiness of an aircraft.

(B) **Review by Secretary.**--Notwithstanding subparagraph (A), the Under Secretary may take such an action, after receiving a notification concerning the action from the Administrator under subparagraph (A), if the Secretary of Transportation subsequently approves the action.

(m) **Personnel and services; cooperation by Under Secretary.**--

(1) **Authority of Under Secretary.**--In carrying out the functions of the Administration, the Under Secretary shall have the same authority as is provided to the Administrator of the Federal Aviation Administration under subsections (l) and (m) of section 106.

(2) **Authority of agency heads.**--The head of a Federal agency shall have the same authority to provide services, supplies, equipment, personnel, and facilities to the Under Secretary as the head has to provide services, supplies, equipment, personnel, and facilities to the Administrator of the Federal Aviation Administration under section 106(m).

(n) **Personnel management system.**--The personnel management system established by the Administrator of the Federal Aviation Administration under section 40122 shall apply to employees of the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the personnel management system with respect to such employees as the Under Secretary considers appropriate, such as adopting aspects of other personnel systems of the Department of Transportation.

(o) **Authority of Inspector General.**--The Transportation Security Administration shall be subject to the Inspector General Act of 1978 (5 U.S.C. App.) and other laws relating to the authority of the Inspector General of the Department of Transportation.

(p) **Law enforcement powers.**--

(1) **In general.**--The Under Secretary may designate an employee of the Transportation Security Administration or other Federal agency to serve as a law enforcement officer.

(2) **Powers.**--While engaged in official duties of the Administration as required to fulfill the responsibilities under this section, a law enforcement officer designated under paragraph (1) may--

(A) carry a firearm;

(B) make an arrest without a warrant for any offense against the United States committed in the presence of the officer, or for any felony cognizable under the laws of the United States if the officer has probable cause to believe that the person to be arrested has committed or is committing the felony; and

(C) seek and execute warrants for arrest or seizure of evidence issued under the authority of the United States upon probable cause that a violation has been committed.

(3) **Guidelines on exercise of authority.**--The authority provided by this subsection shall be exercised in accordance with guidelines prescribed by the Under Secretary, in consultation with the Attorney General of the United States, and shall include adherence to the Attorney General's policy on use of deadly force.

(4) **Revocation or suspension of authority.**--The powers authorized by this subsection may be rescinded or suspended should the Attorney General determine that the Under Secretary has not complied with the guidelines prescribed in paragraph (3) and conveys the determination in writing to the Secretary of Transportation and the Under Secretary.

(q) **Authority to exempt.**--The Under Secretary may grant an exemption from a regulation prescribed in carrying out this section if the Under Secretary determines that the exemption is in the public interest.

(r) **Nondisclosure of security activities.**--

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 114. Transportation Security Administration. 49 USCA § 114

(1) **In general.**--Notwithstanding section 552 of title 5, the Under Secretary shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act (Public Law 107-71) or under chapter 449 of this title if the Under Secretary decides that disclosing the information would--

(A) be an unwarranted invasion of personal privacy;

(B) reveal a trade secret or privileged or confidential commercial or financial information; or

(C) be detrimental to the security of transportation.

(2) **Availability of information to Congress.**--Paragraph (1) does not authorize information to be withheld from a committee of Congress authorized to have the information.

(3) **Limitation on transferability of duties.**--Except as otherwise provided by law, the Under Secretary may not transfer a duty or power under this subsection to another department, agency, or instrumentality of the United States.

(4) **Limitations.**--Nothing in this subsection, or any other provision of law, shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)--

(A) to conceal a violation of law, inefficiency, or administrative error;

(B) to prevent embarrassment to a person, organization, or agency;

(C) to restrain competition; or

(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.

(s) **Transportation security strategic planning.**--

(1) **In general.**--The Secretary of Homeland Security shall develop, prepare, implement, and update, as needed--

(A) a National Strategy for Transportation Security; and

(B) transportation modal security plans addressing security risks, including threats, vulnerabilities, and consequences, for aviation, railroad, ferry, highway, maritime, pipeline, public transportation, over-the-road bus, and other transportation infrastructure assets.

(2) **Role of Secretary of Transportation.**--The Secretary of Homeland Security shall work jointly with the Secretary of Transportation in developing, revising, and updating the documents required by paragraph (1).

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 114. Transportation Security Administration, 49 USCA § 114

**(3) Contents of National Strategy for Transportation Security.**--The National Strategy for Transportation Security shall include the following:

(A) An identification and evaluation of the transportation assets in the United States that, in the interests of national security and commerce, must be protected from attack or disruption by terrorist or other hostile forces, including modal security plans for aviation, bridge and tunnel, commuter rail and ferry, highway, maritime, pipeline, rail, mass transit, over-the-road bus, and other public transportation infrastructure assets that could be at risk of such an attack or disruption.

(B) The development of risk-based priorities, based on risk assessments conducted or received by the Secretary of Homeland Security (including assessments conducted under the Implementing Recommendations of the 9/11 Commission Act of 2007 across all transportation modes and realistic deadlines for addressing security needs associated with those assets referred to in subparagraph (A).

(C) The most appropriate, practical, and cost-effective means of defending those assets against threats to their security.

(D) A forward-looking strategic plan that sets forth the agreed upon roles and missions of Federal, State, regional, local, and tribal authorities and establishes mechanisms for encouraging cooperation and participation by private sector entities, including nonprofit employee labor organizations, in the implementation of such plan.

(E) A comprehensive delineation of prevention, response, and recovery responsibilities and issues regarding threatened and executed acts of terrorism within the United States and threatened and executed acts of terrorism outside the United States to the extent such acts affect United States transportation systems.

(F) A prioritization of research and development objectives that support transportation security needs, giving a higher priority to research and development directed toward protecting vital transportation assets. Transportation security research and development projects shall be based, to the extent practicable, on such prioritization. Nothing in the preceding sentence shall be construed to require the termination of any research or development project initiated by the Secretary of Homeland Security or the Secretary of Transportation before the date of enactment of the Implementing Recommendations of the 9/11 Commission Act of 2007.

(G) A 3- and 10-year budget for Federal transportation security programs that will achieve the priorities of the National Strategy for Transportation Security.

(H) Methods for linking the individual transportation modal security plans and the programs contained therein, and a plan for addressing the security needs of intermodal transportation.

(I) Transportation modal security plans described in paragraph (1)(B), including operational recovery plans to expedite, to the maximum extent practicable, the return to operation of an adversely affected transportation system following a major terrorist attack on that system or other incident. These plans shall be coordinated with the resumption of trade protocols required under section 202 of the SAFE Port Act (6 U.S.C. 942) and the National Maritime Transportation Security Plan required under section 70103(a) of title 46.

**(4) Submissions of plans to Congress.--**

§ 114. Transportation Security Administration, 49 USCA § 114

(A) **Initial strategy.**--The Secretary of Homeland Security shall submit the National Strategy for Transportation Security, including the transportation modal security plans, developed under this subsection to the appropriate congressional committees not later than April 1, 2005.

(B) **Subsequent versions.**--After December 31, 2005, the Secretary of Homeland Security shall submit the National Strategy for Transportation Security, including the transportation modal security plans and any revisions to the National Strategy for Transportation Security and the transportation modal security plans, to appropriate congressional committees not less frequently than April 1 of each even-numbered year.

(C) **Periodic progress report.**--

(i) **Requirement for report.**--Each year, in conjunction with the submission of the budget to Congress under section 1105(a) of title 31, United States Code, the Secretary of Homeland Security shall submit to the appropriate congressional committees an assessment of the progress made on implementing the National Strategy for Transportation Security, including the transportation modal security plans.

(ii) **Content.**--Each progress report submitted under this subparagraph shall include, at a minimum, the following:

(I) Recommendations for improving and implementing the National Strategy for Transportation Security and the transportation modal and intermodal security plans that the Secretary of Homeland Security, in consultation with the Secretary of Transportation, considers appropriate.

(II) An accounting of all grants for transportation security, including grants and contracts for research and development, awarded by the Secretary of Homeland Security in the most recent fiscal year and a description of how such grants accomplished the goals of the National Strategy for Transportation Security.

(III) An accounting of all--

(aa) funds requested in the President's budget submitted pursuant to section 1105 of title 31 for the most recent fiscal year for transportation security, by mode;

(bb) personnel working on transportation security by mode, including the number of contractors; and

(cc) information on the turnover in the previous year among senior staff of the Department of Homeland Security, including component agencies, working on transportation security issues. Such information shall include the number of employees who have permanently left the office, agency, or area in which they worked, and the amount of time that they worked for the Department.

(iii) **Written explanation of transportation security activities not delineated in the National Strategy for Transportation Security.**--At the end of each fiscal year, the Secretary of Homeland Security shall submit to the appropriate congressional committees a written explanation of any Federal transportation security activity that is inconsistent with the National Strategy for Transportation Security, including the amount of funds to be expended for the activity and the number of personnel involved."

§ 114. Transportation Security Administration, 49 USCA § 114

(D) **Classified material.**--Any part of the National Strategy for Transportation Security or the transportation modal security plans that involve information that is properly classified under criteria established by Executive order shall be submitted to the appropriate congressional committees separately in a classified format.

(E) **Appropriate congressional committees defined.**--In this subsection, the term "appropriate congressional committees" means the Committee on Transportation and Infrastructure and the Committee on Homeland Security of the House of Representatives and the Committee on Commerce, Science, and Transportation, the Committee on Homeland Security and Governmental Affairs, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(5) **Priority status.**--

(A) **In general.**--The National Strategy for Transportation Security shall be the governing document for Federal transportation security efforts.

(B) **Other plans and reports.**--The National Strategy for Transportation Security shall include, as an integral part or as an appendix--

(i) the current National Maritime Transportation Security Plan under section 70103 of title 46;

(ii) the report required by section 44938 of this title;

(iii) transportation modal security plans required under this section;

(iv) the transportation sector specific plan required under Homeland Security Presidential Directive-7; and

(v) any other transportation security plan or report that the Secretary of Homeland Security determines appropriate for inclusion.

(6) **Coordination.**--In carrying out the responsibilities under this section, the Secretary of Homeland Security, in coordination with the Secretary of Transportation, shall consult, as appropriate, with Federal, State, and local agencies, tribal governments, private sector entities (including nonprofit employee labor organizations), institutions of higher learning, and other entities.

(7) **Plan distribution.**--The Secretary of Homeland Security shall make available and appropriately publicize an unclassified version of the National Strategy for Transportation Security, including its component transportation modal security plans, to Federal, State, regional, local and tribal authorities, transportation system owners or operators, private sector stakeholders, including nonprofit employee labor organizations representing transportation employees, institutions of higher learning, and other appropriate entities.

[(t) Redesignated (s)]

§ 114. Transportation Security Administration, 49 USCA § 114

(u) Transportation Security Information Sharing Plan.--

  (1) Definitions.--In this subsection:

    (A) Appropriate congressional committees.--The term "appropriate congressional committees" has the meaning given that term in subsection (t).

    (B) Plan.--The term "Plan" means the Transportation Security Information Sharing Plan established under paragraph (2).

    (C) Public and private stakeholders.--The term "public and private stakeholders" means Federal, State, and local agencies, tribal governments, and appropriate private entities, including nonprofit employee labor organizations representing transportation employees.

    (D) Secretary.--The term "Secretary" means the Secretary of Homeland Security.

    (E) Transportation security information.--The term "transportation security information" means information relating to the risks to transportation modes, including aviation, public transportation, railroad, ferry, highway, maritime, pipeline, and over-the-road bus transportation, and may include specific and general intelligence products, as appropriate.

  (2) Establishment of Plan.--The Secretary of Homeland Security, in consultation with the program manager of the information sharing environment established under section 1016 of the Intelligence Reform and Terrorism Prevention Act of 2004 (6 U.S.C. 485), the Secretary of Transportation, and public and private stakeholders, shall establish a Transportation Security Information Sharing Plan. In establishing the Plan, the Secretary shall gather input on the development of the Plan from private and public stakeholders and the program manager of the information sharing environment established under section 1016 of the Intelligence Reform and Terrorism Prevention Act of 2004 (6 U.S.C. 485).

  (3) Purpose of Plan.--The Plan shall promote sharing of transportation security information between the Department of Homeland Security and public and private stakeholders.

  (4) Content of Plan.--The Plan shall include--

    (A) a description of how intelligence analysts within the Department of Homeland Security will coordinate their activities within the Department and with other Federal, State, and local agencies, and tribal governments, including coordination with existing modal information sharing centers and the center described in section 1410 of the Implementing Recommendations of the 9/11 Commission Act of 2007;

    (B) the establishment of a point of contact, which may be a single point of contact within the Department of Homeland Security, for each mode of transportation for the sharing of transportation security information with public and private stakeholders, including an explanation and justification to the appropriate congressional committees if the point of contact established pursuant to this subparagraph differs from the agency within the Department that has the primary authority, or has been delegated such authority by the Secretary, to regulate the security of that transportation mode;

(C) a reasonable deadline by which the Plan will be implemented; and

(D) a description of resource needs for fulfilling the Plan.

(5) **Coordination with information sharing.**--The Plan shall be--

(A) implemented in coordination, as appropriate, with the program manager for the information sharing environment established under section 1016 of the Intelligence Reform and Terrorism Prevention Act of 2004 (6 U.S.C. 485); and

(B) consistent with the establishment of the information sharing environment and any policies, guidelines, procedures, instructions, or standards established by the President or the program manager for the implementation and management of the information sharing environment.

(6) **Reports to Congress.**--

(A) **In general.**--Not later than 150 days after the date of enactment of this subsection, and annually thereafter, the Secretary shall submit to the appropriate congressional committees, a report containing the Plan.

(B) **Annual report.**--Not later than 1 year after the date of enactment of this subsection, the Secretary shall submit to the appropriate congressional committees a report on updates to and the implementation of the Plan.

(7) **Survey and report.**--

(A) **In general.**--The Comptroller General of the United States shall conduct a biennial survey of the satisfaction of recipients of transportation intelligence reports disseminated under the Plan.

(B) **Information sought.**--The survey conducted under subparagraph (A) shall seek information about the quality, speed, regularity, and classification of the transportation security information products disseminated by the Department of Homeland Security to public and private stakeholders.

(C) **Report.**--Not later than 1 year after the date of the enactment of the Implementing Recommendations of the 9/11 Commission Act of 2007, and every even numbered year thereafter, the Comptroller General shall submit to the appropriate congressional committees, a report on the results of the survey conducted under subparagraph (A). The Comptroller General shall also provide a copy of the report to the Secretary.

(8) **Security clearances.**--The Secretary shall, to the greatest extent practicable, take steps to expedite the security clearances needed for designated public and private stakeholders to receive and obtain access to classified information distributed under this section, as appropriate.

(9) **Classification of material.**--The Secretary, to the greatest extent practicable, shall provide designated public and private stakeholders with transportation security information in an unclassified format.

ADD18

§ 114. Transportation Security Administration, 49 USCA § 114

**(v) Enforcement of regulations and orders of the Secretary of Homeland Security.--**

(1) Application of subsection.--

(A) **In general.**--This subsection applies to the enforcement of regulations prescribed, and orders issued, by the Secretary of Homeland Security under a provision of chapter 701 of title 46 and under a provision of this title other than a provision of chapter 449 (in this subsection referred to as an "applicable provision of this title").

(B) **Violations of chapter 449.**--The penalties for violations of regulations prescribed and orders issued by the Secretary of Homeland Security under chapter 449 of this title are provided under chapter 463 of this title.

(C) **Nonapplication to certain violations.**--

(i) Paragraphs (2) through (5) do not apply to violations of regulations prescribed, and orders issued, by the Secretary of Homeland Security under a provision of this title--

(I) involving the transportation of personnel or shipments of materials by contractors where the Department of Defense has assumed control and responsibility;

(II) by a member of the armed forces of the United States when performing official duties; or

(III) by a civilian employee of the Department of Defense when performing official duties.

(ii) Violations described in subclause (I), (II), or (III) of clause (i) shall be subject to penalties as determined by the Secretary of Defense or the Secretary's designee.

(2) Civil penalty.--

(A) **In general.**--A person is liable to the United States Government for a civil penalty of not more than $10,000 for a violation of a regulation prescribed, or order issued, by the Secretary of Homeland Security under an applicable provision of this title.

(B) **Repeat violations.**--A separate violation occurs under this paragraph for each day the violation continues.

(3) Administrative imposition of civil penalties.--

(A) **In general.**--The Secretary of Homeland Security may impose a civil penalty for a violation of a regulation prescribed, or order issued, under an applicable provision of this title. The Secretary shall give written notice of the finding of a violation and the penalty.

(B) **Scope of civil action.**--In a civil action to collect a civil penalty imposed by the Secretary under this subsection, a

ADD19

court may not re-examine issues of liability or the amount of the penalty.

(C) **Jurisdiction.**--The district courts of the United States shall have exclusive jurisdiction of civil actions to collect a civil penalty imposed by the Secretary under this subsection if--

(i) the amount in controversy is more than--

(I) $400,000, if the violation was committed by a person other than an individual or small business concern; or

(II) $50,000 if the violation was committed by an individual or small business concern;

(ii) the action is in rem or another action in rem based on the same violation has been brought; or

(iii) another action has been brought for an injunction based on the same violation.

(D) **Maximum penalty.**--The maximum civil penalty the Secretary administratively may impose under this paragraph is--

(i) $400,000, if the violation was committed by a person other than an individual or small business concern; or

(ii) $50,000, if the violation was committed by an individual or small business concern.

(E) **Notice and opportunity to request hearing.**--Before imposing a penalty under this section the Secretary shall provide to the person against whom the penalty is to be imposed--

(i) written notice of the proposed penalty; and

(ii) the opportunity to request a hearing on the proposed penalty, if the Secretary receives the request not later than 30 days after the date on which the person receives notice.

(4) **Compromise and setoff.**--

(A) The Secretary may compromise the amount of a civil penalty imposed under this subsection.

(B) The Government may deduct the amount of a civil penalty imposed or compromised under this subsection from amounts it owes the person liable for the penalty.

(5) **Investigations and proceedings.**--Chapter 461 shall apply to investigations and proceedings brought under this subsection to the same extent that it applies to investigations and proceedings brought with respect to aviation security duties designated to be carried out by the Secretary.

§ 114. Transportation Security Administration, 49 USCA § 114

(6) **Definitions.**--In this subsection:

(A) **Person.**--The term "person" does not include--

(i) the United States Postal Service; or

(ii) the Department of Defense.

(B) **Small business concern.**--The term "small business concern" has the meaning given that term in section 3 of the Small Business Act (15 U.S.C. 632).

(7) **Enforcement transparency.**--

(A) **In general.**--Not later than December 31, 2008, and annually thereafter, the Secretary shall--

(i) provide an annual summary to the public of all enforcement actions taken by the Secretary under this subsection; and

(ii) include in each such summary the docket number of each enforcement action, the type of alleged violation, the penalty or penalties proposed, and the final assessment amount of each penalty.

(B) **Electronic availability.**--Each summary under this paragraph shall be made available to the public by electronic means.

(C) **Relationship to the Freedom of Information Act and the Privacy Act.** --Nothing in this subsection shall be construed to require disclosure of information or records that are exempt from disclosure under sections 552 or 552a of title 5.

(D) **Enforcement guidance.**--Not later than 180 days after the enactment of the Implementing Recommendations of the 9/11 Commission Act of 2007, the Secretary shall provide a report to the public describing the enforcement process established under this subsection.

(w) **Authorization of appropriations.**--There are authorized to be appropriated to the Secretary of Homeland Security for--

(1) **Railroad security.**--

(A) $488,000,000 for fiscal year 2008;

(B) $483,000,000 for fiscal year 2009;

(C) $508,000,000 for fiscal year 2010; and

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

§ 114. Transportation Security Administration, 49 USCA § 114

(D) $508,000,000 for fiscal year 2011;

(2) Over-the-road bus and trucking security.--

(A) $14,000,000 for fiscal year 2008;

(B) $27,000,000 for fiscal year 2009;

(C) $27,000,000 for fiscal year 2010; and

(D) $27,000,000 for fiscal year 2011; and

(3) Hazardous material and pipeline security.--

(A) $12,000,000 for fiscal year 2008;

(B) $12,000,000 for fiscal year 2009; and

(C) $12,000,000 for fiscal year 2010.

CREDIT(S)
(Added Pub.L. 107-71, Title I, § 101(a), Nov. 19, 2001, 115 Stat. 597; amended Pub.L. 107-296, Title XVI, § 1601(b), Title XVII, § 1707, Nov. 25, 2002, 116 Stat. 2312, 2318; Pub.L. 108-7, Div. I, Title III, § 351(d), Feb. 20, 2003, 117 Stat. 420; Pub.L. 108-458, Title IV, § 4001(a), Dec. 17, 2004, 118 Stat. 3710; Pub.L. 110-53, Title XII, §§ 1202, 1203(a), Title XIII, § 1302(a), Title XV, § 1503(a), Aug. 3, 2007, 121 Stat. 381, 390, 425; Pub.L. 110-161, Div. E, Title V, § 568(a), Dec. 26, 2007, 121 Stat. 2092; Pub.L. 111-83, Title V, § 561(c)(1), Oct. 28, 2009, 123 Stat. 2182.)

Notes of Decisions (8)

49 U.S.C.A. § 114, 49 USCA § 114
Current through P.L. 113-47 approved 10-31-13

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 46110. Judicial review, 49 USCA § 46110

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VII. Aviation Programs
      Part A. Air Commerce and Safety (Refs & Annos)
        Subpart IV. Enforcement and Penalties (Refs & Annos)
          Chapter 461. Investigations and Proceedings

49 U.S.C.A. § 46110

§ 46110. Judicial review

Effective: December 12, 2003

Currentness

(a) **Filing and venue.**--Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) **Judicial procedures.**--When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Under Secretary, or Administrator, as appropriate. The Secretary, Under Secretary, or Administrator shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) **Authority of court.**--When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

(d) **Requirement for prior objection.**--In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

(e) **Supreme Court review.**--A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

**CREDIT(S)**
(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1230; amended Pub.L. 107-71, Title I, § 140(b)(1), (2), Nov. 19,

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 46110. Judicial review, 49 USCA § 46110

2001, 115 Stat. 641; Pub.L. 108-176, Title II, § 228, Dec. 12, 2003, 117 Stat. 2532.)

Notes of Decisions (127)

49 U.S.C.A. § 46110, 49 USCA § 46110
Current through P.L. 113-47 approved 10-31-13

End of Document                                                © 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

§ 44901. Screening passengers and property, 49 USCA § 44901

| United States Code Annotated |
| --- |
| Title 49. Transportation (Refs & Annos) |
| Subtitle VII. Aviation Programs |
| Part A. Air Commerce and Safety (Refs & Annos) |
| Subpart III. Safety (Refs & Annos) |
| Chapter 449. Security |
| Subchapter I. Requirements |

49 U.S.C.A. § 44901

§ 44901. Screening passengers and property

Effective: December 20, 2012

Currentness

(a) **In general.**--The Under Secretary of Transportation for Security shall provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation. In the case of flights and flight segments originating in the United States, the screening shall take place before boarding and shall be carried out by a Federal Government employee (as defined in section 2105 of title 5, United States Code), except as otherwise provided in section 44919 or 44920 and except for identifying passengers and baggage for screening under the CAPPS and known shipper programs and conducting positive bag-match programs.

(b) **Supervision of screening.**--All screening of passengers and property at airports in the United States where screening is required under this section shall be supervised by uniformed Federal personnel of the Transportation Security Administration who shall have the power to order the dismissal of any individual performing such screening.

(c) **Checked baggage.**--A system must be in operation to screen all checked baggage at all airports in the United States as soon as practicable but not later than the 60th day following the date of enactment of the Aviation and Transportation Security Act.

(d) **Explosives detection systems.**--

(1) **In general.**--The Under Secretary of Transportation for Security shall take all necessary action to ensure that--

(A) explosives detection systems are deployed as soon as possible to ensure that all United States airports described in section 44903(c) have sufficient explosives detection systems to screen all checked baggage no later than December 31, 2002, and that as soon as such systems are in place at an airport, all checked baggage at the airport is screened by those

**ADD25**

§ 44901. Screening passengers and property, 49 USCA § 44901

systems; and

**(B)** all systems deployed under subparagraph (A) are fully utilized; and

**(C)** if explosives detection equipment at an airport is unavailable, all checked baggage is screened by an alternative means.

**(2) Deadline.--**

**(A) In general.--**If, in his discretion or at the request of an airport, the Under Secretary of Transportation for Security determines that the Transportation Security Administration is not able to deploy explosives detection systems required to be deployed under paragraph (1) at all airports where explosives detection systems are required by December 31, 2002, then with respect to each airport for which the Under Secretary makes that determination--

**(i)** the Under Secretary shall submit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Transportation and Infrastructure a detailed plan (which may be submitted in classified form) for the deployment of the number of explosives detection systems at that airport necessary to meet the requirements of paragraph (1) as soon as practicable at that airport but in no event later than December 31, 2003; and

**(ii)** the Under Secretary shall take all necessary action to ensure that alternative means of screening all checked baggage is implemented until the requirements of paragraph (1) have been met.

**(B) Criteria for determination.--**In making a determination under subparagraph (A), the Under Secretary shall take into account--

**(i)** the nature and extent of the required modifications to the airport's terminal buildings, and the technical, engineering, design and construction issues;

**(ii)** the need to ensure that such installations and modifications are effective; and

**(iii)** the feasibility and cost-effectiveness of deploying explosives detection systems in the baggage sorting area or other non-public area rather than the lobby of an airport terminal building.

**(C) Response.--**The Under Secretary shall respond to the request of an airport under subparagraph (A) within 14 days of

**ADD26**

§ 44901. Screening passengers and property, 49 USCA § 44901

receiving the request. A denial of request shall create no right of appeal or judicial review.

**(D) Airport effort required.**--Each airport with respect to which the Under Secretary makes a determination under subparagraph (A) shall--

(i) cooperate fully with the Transportation Security Administration with respect to screening checked baggage and changes to accommodate explosives detection systems; and

(ii) make security projects a priority for the obligation or expenditure of funds made available under chapter 417 or 471 until explosives detection systems required to be deployed under paragraph (1) have been deployed at that airport.

**(3) Reports.**--Until the Transportation Security Administration has met the requirements of paragraph (1), the Under Secretary shall submit a classified report every 30 days after the date of enactment of this Act to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Transportation and Infrastructure describing the progress made toward meeting such requirements at each airport.

**(4) Preclearance airports.**--

**(A) In general.**--For a flight or flight segment originating at an airport outside the United States and traveling to the United States with respect to which checked baggage has been screened in accordance with an aviation security preclearance agreement between the United States and the country in which such airport is located, the Assistant Secretary (Transportation Security Administration) may, in coordination with U.S. Customs and Border Protection, determine whether such baggage must be re-screened in the United States by an explosives detection system before such baggage continues on any additional flight or flight segment.

**(B) Aviation security preclearance agreement defined.**--In this paragraph, the term "aviation security preclearance agreement" means an agreement that delineates and implements security standards and protocols that are determined by the Assistant Secretary, in coordination with U.S. Customs and Border Protection, to be comparable to those of the United States and therefore sufficiently effective to enable passengers to deplane into sterile areas of airports in the United States.

**(C) Report.**--The Assistant Secretary shall submit to the Committee on Homeland Security of the House of Representatives, the Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Homeland Security and Governmental Affairs of the Senate an annual report on the re-screening of baggage under this paragraph. Each such report shall include the following for the year covered by the report:

(i) A list of airports outside the United States from which a flight or flight segment traveled to the United States for which the Assistant Secretary determined, in accordance with the authority under subparagraph (A), that checked

**ADD27**

§ 44901. Screening passengers and property, 49 USCA § 44901

baggage was not required to be re-screened in the United States by an explosives detection system before such baggage continued on an additional flight or flight segment.

(ii) The amount of Federal savings generated from the exercise of such authority.

(e) **Mandatory screening where EDS not yet available.**--As soon as practicable but not later than the 60th day following the date of enactment of the Aviation and Transportation Security Act and until the requirements of subsection (b)(1)(A) are met, the Under Secretary shall require alternative means for screening any piece of checked baggage that is not screened by an explosives detection system. Such alternative means may include 1 or more of the following:

(1) A bag-match program that ensures that no checked baggage is placed aboard an aircraft unless the passenger who checked the baggage is aboard the aircraft.

(2) Manual search.

(3) Search by canine explosives detection units in combination with other means.

(4) Other means or technology approved by the Under Secretary.

(f) **Cargo deadline.**--A system must be in operation to screen, inspect, or otherwise ensure the security of all cargo that is to be transported in all-cargo aircraft in air transportation and intrastate air transportation as soon as practicable after the date of enactment of the Aviation and Transportation Security Act.

(g) **Air cargo on passenger aircraft.**--

(1) **In general.**--Not later than 3 years after the date of enactment of the Implementing Recommendations of the 9/11 Commission Act of 2007, the Secretary of Homeland Security shall establish a system to screen 100 percent of cargo transported on passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation to ensure the security of all such passenger aircraft carrying cargo.

(2) **Minimum standards.**--The system referred to in paragraph (1) shall require, at a minimum, that equipment, technology, procedures, personnel, or other methods approved by the Administrator of the Transportation Security Administration, are used to screen cargo carried on passenger aircraft described in paragraph (1) to provide a level of security commensurate with the level of security for the screening of passenger checked baggage as follows:

**ADD28**

**(A)** 50 percent of such cargo is so screened not later than 18 months after the date of enactment of the Implementing Recommendations of the 9/11 Commission Act of 2007.

**(B)** 100 percent of such cargo is so screened not later than 3 years after such date of enactment.

**(3) Regulations.--**

**(A) Interim final rule.--**The Secretary of Homeland Security may issue an interim final rule as a temporary regulation to implement this subsection without regard to the provisions of chapter 5 of title 5.

**(B) Final rule.--**

**(i) In general.--**If the Secretary issues an interim final rule under subparagraph (A), the Secretary shall issue, not later than one year after the effective date of the interim final rule, a final rule as a permanent regulation to implement this subsection in accordance with the provisions of chapter 5 of title 5.

**(ii) Failure to act.--**If the Secretary does not issue a final rule in accordance with clause (i) on or before the last day of the one-year period referred to in clause (i), the Secretary shall submit to the Committee on Homeland Security of the House of Representatives, Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Homeland Security and Governmental Affairs of the Senate a report explaining why the final rule was not timely issued and providing an estimate of the earliest date on which the final rule will be issued. The Secretary shall submit the first such report within 10 days after such last day and submit a report to the Committees containing updated information every 30 days thereafter until the final rule is issued.

**(iii) Superceding[i] of interim final rule.--**The final rule issued in accordance with this subparagraph shall supersede the interim final rule issued under subparagraph (A).

**(4) Report.--**Not later than 1 year after the date of establishment of the system under paragraph (1), the Secretary shall submit to the Committees referred to in paragraph (3)(B)(ii) a report that describes the system.

**(5) Screening defined.--**In this subsection the term "screening" means a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security. Methods of screening include x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams certified by the Transportation Security Administration, or a physical search together with manifest verification. The Administrator may approve additional methods to ensure that the cargo does not pose a threat to transportation security and to assist in meeting the requirements of this subsection. Such additional cargo screening methods shall not include solely performing a review of information about the contents of cargo or verifying the identity of a shipper of the cargo that is not performed in conjunction with other security methods authorized under this subsection, including whether a known shipper is registered in the known

**ADD29**

§ 44901. Screening passengers and property, 49 USCA § 44901

shipper database. Such additional cargo screening methods may include a program to certify the security methods used by shippers pursuant to paragraphs (1) and (2) and alternative screening methods pursuant to exemptions referred to in subsection (b) of section 1602 of the Implementing Recommendations of the 9/11 Commission Act of 2007.

**(h) Deployment of armed personnel.--**

**(1) In general.--**The Under Secretary shall order the deployment of law enforcement personnel authorized to carry firearms at each airport security screening location to ensure passenger safety and national security.

**(2) Minimum requirements.--**Except at airports required to enter into agreements under subsection (c), the Under Secretary shall order the deployment of at least 1 law enforcement officer at each airport security screening location. At the 100 largest airports in the United States, in terms of annual passenger enplanements for the most recent calendar year for which data are available, the Under Secretary shall order the deployment of additional law enforcement personnel at airport security screening locations if the Under Secretary determines that the additional deployment is necessary to ensure passenger safety and national security.

**(i) Exemptions and advising Congress on regulations.--**The Under Secretary--

**(1)** may exempt from this section air transportation operations, except scheduled passenger operations of an air carrier providing air transportation under a certificate issued under section 41102 of this title or a permit issued under section 41302 of this title; and

**(2)** shall advise Congress of a regulation to be prescribed under this section at least 30 days before the effective date of the regulation, unless the Under Secretary decides an emergency exists requiring the regulation to become effective in fewer than 30 days and notifies Congress of that decision.

**(j) Blast-resistant cargo containers.--**

**(1) In general.--**Before January 1, 2008, the Administrator of the Transportation Security Administration shall--

**(A)** evaluate the results of the blast-resistant cargo container pilot program that was initiated before the date of enactment of this subsection; and

**(B)** prepare and distribute through the Aviation Security Advisory Committee to the appropriate Committees of Congress and air carriers a report on that evaluation which may contain nonclassified and classified sections.

**ADD30**

§ 44901. Screening passengers and property, 49 USCA § 44901

(2) **Acquisition, maintenance, and replacement.**--Upon completion and consistent with the results of the evaluation that paragraph (1)(A) requires, the Administrator shall--

  (A) develop and implement a program, as the Administrator determines appropriate, to acquire, maintain, and replace blast-resistant cargo containers;

  (B) pay for the program; and

  (C) make available blast-resistant cargo containers to air carriers pursuant to paragraph (3).

  (3) **Distribution to air carriers.**--The Administrator shall make available, beginning not later than July 1, 2008, blast-resistant cargo containers to air carriers for use on a risk managed basis as determined by the Administrator.

(k) **General aviation airport security program.**--

  (1) **In general.**--Not later than one year after the date of enactment of this subsection, the Administrator of the Transportation Security Administration shall--

  (A) develop a standardized threat and vulnerability assessment program for general aviation airports (as defined in section 47134(m)); and

  (B) implement a program to perform such assessments on a risk-managed basis at general aviation airports.

  (2) **Grant program.**--Not later than 6 months after the date of enactment of this subsection, the Administrator shall initiate and complete a study of the feasibility of a program, based on a risk-managed approach, to provide grants to operators of general aviation airports (as defined in section 47134(m)) for projects to upgrade security at such airports. If the Administrator determines that such a program is feasible, the Administrator shall establish such a program.

  (3) **Application to general aviation aircraft.**--Not later than 180 days after the date of enactment of this subsection, the Administrator shall develop a risk-based system under which--

  (A) general aviation aircraft, as identified by the Administrator, in coordination with the Administrator of the Federal

**ADD31**

Aviation Administration, are required to submit passenger information and advance notification requirements for United States Customs and Border Protection before entering United States airspace; and

(B) such information is checked against appropriate databases.

(4) **Authorization of appropriations.**--There are authorized to be appropriated to the Administrator of the Transportation Security Administration such sums as may be necessary to carry out paragraphs (2) and (3).

(l) **Limitations on use of advanced imaging technology for screening passengers.--**

(1) **Definitions.**--In this subsection, the following definitions apply:

(A) **Advanced imaging technology.**--The term "advanced imaging technology"--

(i) means a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body; and

(ii) may include devices using backscatter x-rays or millimeter waves and devices referred to as "whole-body imaging technology" or "body scanning machines".

(B) **Appropriate congressional committees.**--The term "appropriate congressional committees" means--

(i) the Committee on Commerce, Science, and Transportation and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(ii) the Committee on Homeland Security of the House of Representatives.

(C) **Automatic target recognition software.**--The term "automatic target recognition software" means software installed on an advanced imaging technology that produces a generic image of the individual being screened that is the same as the images produced for all other screened individuals.

(2) **Use of advanced imaging technology.**--Beginning June 1, 2012, the Assistant Secretary of Homeland Security

**ADD32**

§ 44901. Screening passengers and property, 49 USCA § 44901

(Transportation Security Administration) shall ensure that any advanced imaging technology used for the screening of passengers under this section--

  (A) is equipped with and employs automatic target recognition software; and

  (B) complies with such other requirements as the Assistant Secretary determines necessary to address privacy considerations.

(3) Extension.--

  (A) In general.--The Assistant Secretary may extend the deadline specified in paragraph (2), if the Assistant Secretary determines that--

    (i) an advanced imaging technology equipped with automatic target recognition software is not substantially as effective at screening passengers as an advanced imaging technology without such software; or

    (ii) additional testing of such software is necessary.

  (B) Duration of extensions.--The Assistant Secretary may issue one or more extensions under subparagraph (A). The duration of each extension may not exceed one year.

(4) Reports.--

  (A) In general.--Not later than 60 days after the deadline specified in paragraph (2), and not later than 60 days after the date on which the Assistant Secretary issues any extension under paragraph (3), the Assistant Secretary shall submit to the appropriate congressional committees a report on the implementation of this subsection.

  (B) Elements.--A report submitted under subparagraph (A) shall include the following:

    (i) A description of all matters the Assistant Secretary considers relevant to the implementation of the requirements of this subsection.

**ADD33**

§ 44901. Screening passengers and property, 49 USCA § 44901

(ii) The status of compliance by the Transportation Security Administration with such requirements.

(iii) If the Administration is not in full compliance with such requirements--

(I) the reasons for the noncompliance; and

(II) a timeline depicting when the Assistant Secretary expects the Administration to achieve full compliance.

(C) Security classification.--To the greatest extent practicable, a report prepared under subparagraph (A) shall be submitted in an unclassified format. If necessary, the report may include a classified annex.

**CREDIT(S)**

(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1204; amended Pub.L. 107-71, Title I, §§ 101(f)(7), (9), 110(b), Nov. 19, 2001, 115 Stat. 603, 614; Pub.L. 107-296, Title IV, § 425, Nov. 25, 2002, 116 Stat. 2185; Pub.L. 110-53, Title XVI, §§ 1602(a), 1609, 1617, Aug. 3, 2007, 121 Stat. 477, 484, 488; Pub.L. 112-95, Title VIII, § 826, Feb. 14, 2012, 126 Stat. 132; Pub.L. 112-218, § 2, Dec. 20, 2012, 126 Stat. 1593.)

Notes of Decisions (11)

Footnotes

1
    So in original.

49 U.S.C.A. § 44901, 49 USCA § 44901
Current through P.L. 114-115 approved 12-28-2015

End of Document    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**ADD34**